Jon TURNER and Nicole Turner, Appellants,

v.

The CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS, The Corporation of the Bishop of the Church of Jesus Christ of Latter–Day Saints, and the Corporation of the President of the Church of Jesus Christ of Latter–Day Saints, Appellees.

No. 05–99–00366–CV.

Court of Appeals of Texas, Dallas.

May 25, 2000.

Charles W. McGarry, Law Offices of Charles W. McGarry, Dallas, for Appellants.

Robert H. Mow, Jr., Hughes & Luce, L.L.P., Dallas, for Appellees.

Before Justices KINKEADE, JAMES, and FITZGERALD.

## OPINION

Opinion by Justice FITZGERALD.

Jon Turner (Turner) and his wife, Nicole Turner, sued the Church of Jesus Christ of Latter–Day Saints, the Corporation of the Bishop of the Church of Jesus Christ of Latter–Day Saints, and the Corporation of the President of the Church of Jesus Christ of Latter–Day Saints (collectively "the Church") for injuries Turner allegedly suffered as a result of his missionary work for the Church in Guatemala. The Church filed a motion for summary judgment asserting that all of the Turners' causes of action were barred by the First Amendment and that no evidence supported their intentional tort causes of action. The trial court granted the Church's motion for summary judgment. The Turners appeal the take-nothing summary judgment the trial court rendered in favor of the Church.

1. *See Matthew* 28:19; *Mark* 16:15.

We resolve the issues presented by the Turners against them and affirm the trial court's judgment.

## FACTUAL BACKGROUND

The Church of Jesus Christ of Latter–Day Saints is a world-wide religious institution based in Salt Lake City, Utah. The Church takes literally its responsibility set out in the Gospels of St. Matthew and St. Mark to preach the gospel to all peoples and to baptize them.[1] To this end, the Church has more than 58,000 missionaries in 331 missions in 115 countries and territories around the world introducing people to the Church and spreading the gospel. The missionary program is the Church's primary means of introducing the public to the Church and of bringing new members into its fold. Spreading the Church's message of the gospel is an important responsibility of all Church members. The Church encourages members who are nineteen to twenty-six years of age to become missionaries for the Church for a two-year term.

The missionary's role is to spread the Church's religious message and to baptize new members. Church members wishing to become missionaries apply to the Church with the recommendation of their bishop. The Church's highest governing body, the Quorum of Twelve, selects the missionaries, and the President of the Church notifies the chosen members of their calling to be a missionary. The missionaries are part of the clergy of the Church.

New missionaries attend training courses at a missionary training center before beginning their missions. The training courses instruct the missionaries on religious principles, the "missionary discussions," and the techniques for delivering the Church's message. The training program for missionaries assigned to areas

where the language spoken is not the missionary's native tongue lasts eight weeks and includes extensive language training, including doctrinal gospel language training. The missionaries receive instruction on the culture of the area they are assigned to. They also receive guidance to help them in the rigorous life they are about to lead, including medical and health care, companion relationships, and developing "a working relationship with their Heavenly Father." When their training is completed, the missionaries are transported to the area of the world where they will serve their mission. The Church maintains an office in each mission region to assist the missionaries.

Jon Turner is a life-long member of the Church and had wanted to be a missionary since he was eight years old. When he was of age, he applied to the Church to become a missionary and was interviewed by the bishop for his region as well as the regional president concerning his religious beliefs and spiritual preparedness to become a missionary. These authorities approved him and, after passing a physical examination, Turner received a letter from the President of the Church informing him of his calling to be a missionary in Guatemala. After learning he would be living in Guatemala for two years, Turner's research on the country was limited to examining an article on Guatemala in an encyclopedia.

Turner reported to the missionary training center for the United States and Canada in Provo, Utah, on June 9, 1993 for eight weeks' training. He came down with infectious mononucleosis while he was there. He visited the medical clinic several times complaining of being constantly tired and having no energy. The medical staff prescribed a form of penicillin, and Turner's condition improved after a couple of weeks. After Turner completed the training, the Church sent him to its central Guatemala mission on August 9, 1993.

Turner was assigned to a rural area, Pomarrosal, which he described as "a more or less marshy jungle area in the Highlands region" about five hours from Guatemala City. Turner's companion became ill and was returned to the United States, and Turner was reassigned to a larger town, Retalhuleu. For the first few months of his mission, Turner was able to carry out his duties as a missionary with only the usual minor health problems suffered by foreign travelers. Then, in late October 1993, Turner became ill with a fever. Eventually, the fever broke, and Turner's temperature returned to normal. Turner still felt weak, tired easily, and lacked the energy he had before he became ill at the Training Center.

About November 20, 1993, Turner became ill again. He had a fever of 105.8 degrees and a severe headache. He became delirious, and a rash broke out on his arms, legs, neck, and face. A few days later, another missionary took Turner to Guatemala City, where he stayed at the infirmary for missionaries until December 7, 1993. During this period, he felt weak and fatigued, and he continued to suffer from headaches, fever, and nausea. Although he took "numerous medicines," Turner's condition did not improve.

On December 7, 1993, despite his illness, Turner decided to return to his missionary work. As he rode on a bus with his companion, he began to feel sick and dizzy. He stated, "Everything around me seemed distant and dreamlike," and he had to leave the bus immediately. Turner's companion later explained to the mission president that Turner suddenly leaped off the bus because he was afraid someone was chasing him. Turner's illness worsened after a few hours, and he returned to the infirmary where he stayed until December 13. The medicines given to Turner failed to alleviate his symptoms.

On January 1, 1994, the Church flew Turner back to Utah. A Church member

took Turner to the Utah Valley Regional Medical Center, a hospital in Provo. Turner signed a consent-to-treatment form and was admitted to the hospital. Turner was placed in the "behavioral science unit." The hospital staff "confiscated" Turner's belongings and, during his first day there, would not allow him to telephone his parents. A missionary who had been with Turner in Guatemala visited him in the hospital and asked the nurse why he was in "the mental ward." The nurse told her that all of Turner's tests were negative, so his symptoms were in his head. The nurse then told Turner he was "not sick, so get out of bed."

Turner's grandparents also visited him in the hospital. After leaving the hospital, they inquired at the "missionary department" about Turner's condition. An employee checked the missionary department's computer and told them "things like Jon was scared, he hallucinated."

On January 6, 1994, the Church flew Turner back to his home in Dallas. Bishop Jay Jones promised Turner that the Church would pay his medical expenses. However, when Turner tried to use the medical insurance card the Church provided him as a missionary, it was rejected. Turner has remained ill, subject to fevers, and lacking energy. Although Turner's symptoms are consistent with malaria, no doctor has been able to clinically diagnose Turner's health problems.

In its summary judgment evidence, the Church explained that it did not provide malaria prophylaxis to missionaries except to those in areas with a high risk of malaria because the prophylaxis medicine has side effects that result in most people refusing to take it.[2] The central region of

Guatemala where Turner was sent was not considered a high-risk area for malaria. The Church did not provide mosquito netting because it made conditions too hot and most missionaries refused to use it.[3] Although the Church did not provide insect repellant in areas where it could be purchased in local stores, the Church did provide an allowance to the missionaries to purchase insect repellant. Turner testified in his deposition that he used insect repellant.

After Turner returned, he married his wife, Nicole. Turner has been unable to work full time due to his medical difficulties. Turner and Nicole testified that Turner's illness has put a strain on their marriage.

## PROCEDURAL BACKGROUND

The Turners sued the Church for negligence, negligent misrepresentation, breach of fiduciary duty, fraud, defamation, defamation per se, breach of contract, negligent breach of contract, invasion of privacy, false imprisonment, conspiracy to commit false imprisonment, breach of warranties, and intentional infliction of emotional distress. The Turners' claims under these causes of action include allegations that the Church failed to warn Turner of the risk of contracting malaria or other diseases, failed to educate him on preventing malaria and other diseases, failed to provide him with adequate protection from insects and disease, failed to provide adequate medical care in Guatemala, placed him in the behavioral science unit of the Utah Valley Regional Medical Center, terminated his medical insurance, requested copies of

2. According to Dr. DeVon Hale, a member of the Church's Missionary Medical Advisory Committee, the side effects include dizziness, headaches, nausea, skin rashes, diarrhea, and visual changes and affect about forty percent of the people who take the medicine.

3. Turner testified he knew only one missionary who used mosquito netting, and he caught Dengue fever.

his medical records, placed copies of his medical records into his Church record, noted in its records that his mission was terminated due to an emotional or mental problem, published information about his mental condition, and terminated his "Temple Recommend" privileges.

After extensive discovery, the Church moved for summary judgment against the Turners on two grounds: (1) all of their causes of action are barred by the Establishment of Religion and Free Exercise of Religion Clauses of the First Amendment; and (2) no evidence supported the causes of action for breach of fiduciary duty, negligent misrepresentation, fraud, defamation, invasion of privacy, false imprisonment, intentional infliction of emotional distress, and loss of consortium and society.[4] After a hearing, the trial court granted the Church's motion for summary judgment and rendered a take-nothing judgment against the Turners.

## WAIVER FOR FAILURE TO BRIEF

■ The Turners' brief argues that certain of their causes of action were not barred by the Religion Clauses of the First Amendment and that they produced some evidence on certain of their causes of action to overcome the Church's no-evidence motion for summary judgment. However, the Turners' brief does not discuss their causes of action for negligent misrepresentation, negligent breach of contract, breach of warranties, conspiracy to commit false imprisonment, and defamation per se. Moreover, the Turners do not argue in their brief any of their claims under their breach of contract cause of action except their claim that the Church failed to pay or provide promised medical benefits.

■ The failure to argue a cause of action on appeal results in its waiver on

appeal. Because the Turners provided no explanation why the trial court erred in finding these causes of action and claims barred by the First Amendment or supported by no evidence, they have waived these causes of action and claims on appeal. *See Dennis v. First State Bank*, 989 S.W.2d 22, 28 (Tex.App.-Fort Worth 1998, no pet.).

## SUMMARY JUDGMENT: RULE 166a(c)

■ In their first and second issues, the Turners question whether the trial court erred in granting the Church's motion for summary judgment brought under Texas Rule of Civil Procedure 166a(c). The function of a summary judgment is not to deprive a litigant of its right to a full hearing on the merits of any real issue of fact but is to eliminate patently unmeritorious claims and untenable defenses. *See Gulbenkian v. Penn*, 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952). The standards for reviewing a motion for summary judgment under rule 166a(c) are:

- The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

- In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

- Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Montgomery v. Kennedy*, 669 S.W.2d 309, 310–11 (Tex.1984); *Wilcox v. St. Mary's Univ.*, 531 S.W.2d 589, 592–93 (Tex.1975). The purpose of rule 166a(c) is not to provide

---

4. The Turners' petition did not allege loss of consortium and society as a cause of action but included it in their list of damages resulting from their causes of action.

either a trial by deposition or a trial by affidavit but to provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and no genuine issue of material fact remains. *See Gaines v. Hamman,* 163 Tex. 618, 626, 358 S.W.2d 557, 563 (1962). A motion for summary judgment must "stand or fall on the grounds expressly presented in the motion." *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993).

■ A nonmovant need not answer or respond to a motion for summary judgment to contend on appeal that the grounds expressly presented by the movant's motion are insufficient as a matter of law to support summary judgment. However, the nonmovant may not raise any other issues as grounds for reversal. *See* TEX.R. CIV. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

When the defendant is the movant, summary judgment is proper only if the plaintiff cannot, as a matter of law, succeed upon any theory pleaded. *See Peirce v. Sheldon Petroleum Co.,* 589 S.W.2d 849, 852 (Tex.Civ.App.-Amarillo 1979, no writ). Thus, the defendant can prevail by conclusively establishing against the plaintiff at least one factual element of each theory pleaded by the plaintiff, *see Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970), or by conclusively establishing every factual element of an affirmative defense. *See Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). Conversely, the plaintiff can bar summary judgment by presenting evidence that creates a fact question on those elements of the plaintiff's case under attack by the defendant or on at least one element of each affirmative defense advanced by the defendant. *See Torres v. Western Cas. & Sur. Co.,* 457 S.W.2d 50, 52 (Tex.1970); *see also Puga v. Donna Fruit Co.,* 634 S.W.2d 677, 680–81 (Tex.1982). Alternatively, the plaintiff can

defeat the motion by conceding that the material facts are undisputed, but convincing the court that the defendant's legal position is unsound. *See Estate of Devitt,* 758 S.W.2d 601, 602 (Tex.App.-Amarillo 1988, writ denied).

If a trial court's order granting the motion for summary judgment does not state the specific grounds on which it was based, we affirm the summary judgment if any of the movant's grounds support the judgment. *See Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989).

## RELIGION CLAUSES OF THE FIRST AMENDMENT

The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." These two clauses are known, respectively, as the Establishment Clause and the Free Exercise Clause. Although only sixteen words in length, these two clauses have spawned millions of words interpreting them, to which we add today.

In *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Supreme Court gave a concise history of the events leading to the Religion Clauses of the First Amendment. *See id.* at 8–16. The Court described how governments throughout history had used tax monies to subsidize favored religions and had placed onerous burdens, if not outright prohibitions, on disfavored religions. *See id.* The Court stated that the First Amendment, "for the preservation of civil liberty, rescued the temporal institutions from religious interference ... [and] it has secured religious liberty from the invasions of the civil authority." *Id.* at 15, 67 S.Ct. 504 (quoting *Watson v. Jones,* 80 U.S. (13 Wall.) 679, 730, 20 L.Ed. 666 (1872)). The Religion Clauses were "intended to erect 'a wall of separation between Church and State.' " *Id.* at 16, 67

S.Ct. 504 (quoting *Reynolds v. United States*, 98 U.S. 145, 164, 25 L.Ed. 244 (1879)) (quoting Thomas Jefferson, 8 JEFF. WORKS 113 (reply to Danbury Baptist Association)); *see also Illinois ex rel. McCollum v. Board of Educ.*, 333 U.S. 203, 211, 68 S.Ct. 461, 92 L.Ed. 649 (1948). It is this Jeffersonian concept of protecting religion and government from each other through a "wall of separation" that is the foundation for the current interpretation of the Religion Clauses.[5]

## Establishment Clause

■ In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105 (1971), the Supreme Court stressed that the Establishment Clause does not merely prohibit the establishment of a state church; instead, it commands "that there should be 'no law *respecting* an establishment of religion.'" *Id.* at 612, 91 S.Ct. 2105 (quoting U.S. CONST. amend I, cl.1 (emphasis added by Supreme Court)). This special language means that laws which do not establish a religion but that are "a step that could lead to such establishment" violate the First Amendment. *Id. Lemon* and subsequent cases have relied on a three-part test to determine whether a statute or other governmental action constitutes a "law respecting an establishment of religion." For a government act not to be a law respecting an establishment of religion: (1) it "must have a secular legislative purpose"; (2) its "principal or primary effect must be one that neither advances nor inhibits religion"; and (3) it "must not foster 'an excessive government entanglement with religion.'" *Id.* (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)).

■ Application of this test has proved problematic. The majority of Supreme Court cases interpreting the Establishment Clause have concerned government aid to private religious schools. In *Lemon*, the Court considered the constitutionality of a statute providing state funds to private religious schools for reimbursement of the cost of teachers' salaries, textbooks, and instructional materials in certain secular subjects. *See id.* at 606–07, 91 S.Ct. 2105. The Court determined that even though it would not assume the religious schools' teachers would be unsuccessful in segregating their religious beliefs from their secular responsibilities, "the potential for impermissible fostering of religion is present." *Id.* at 619, 91 S.Ct. 2105. The Court determined that the monitoring of the program necessary to prevent state funds from being used for religious purposes would "involve excessive and enduring entanglement between state and church." *Id.* The Court also considered the fact that the program might require examination of the schools' records to determine the amount of expenditures attributable to religious teaching and the amount attributable to secular activity. The Court stated, that "[t]his kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids. It is a relationship pregnant with dangers of excessive government direction of church schools and hence of churches." *Id.* at 620, 91 S.Ct. 2105. Thus, *Lemon* prohibits government monitoring of a religious organization's activities for determining which particular actions within a religious activity are religious and which, if any, are secular.

After *Lemon*, the Supreme Court struck down numerous statutes attempting to provide government aid to religious private schools. *See, e.g., Aguilar v. Felton,*

5. "The values enshrined in the First Amendment plainly rank high 'in the scale of our national values.'" *NLRB v. Catholic Bishop*, 440 U.S. 490, 501, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (quoting *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 17, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963)).

473 U.S. 402, 414, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985) (striking statute providing special education programs under Title I for children in religious schools with strict monitoring to ensure no religious teaching); *School Dist. v. Ball,* 473 U.S. 373, 397–98, 105 S.Ct. 3248, 87 L.Ed.2d 267 (1985) (striking statute providing supplemental secular education courses for children at religious schools); *Meek v. Pittenger,* 421 U.S. 349, 370–73, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975) (striking statute providing "auxiliary services," textbooks, and instructional materials to religious schools); *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 793, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) (striking statute providing payments to religious schools for maintenance and repair, state reimbursement of tuition for religious schools, and state income tax adjustment for religious school tuition); *Levitt v. Committee for Pub. Educ. & Religious Liberty,* 413 U.S. 472, 481–82, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973) (striking statute providing reimbursement to religious schools for cost of administering, grading, and compiling standardized statewide tests and teacher-prepared tests and maintenance of certain records); *see also Board of Educ. v. Grumet,* 512 U.S. 687, 709–10, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (striking statute creating school district consisting almost solely of Satmar Hasidic Jews). The Court overturned the government aid programs in these cases for creating excessive government entanglement with the religious entities due to one or more of the following five grounds:

1. public employees working on a religious school's premises are presumed to inculcate religion in their work;

2. the presence of public employees on private school premises creates a symbolic union between church and state;

3. any and all public aid that directly aids the educational function of religious schools impermissibly finances religious indoctrination, even if the aid reaches such schools as a consequence of private decision making;

4. public employees who teach on the premises of religious schools must be closely monitored to ensure that they do not inculcate religion; and

5. monitoring of a religious school's records to determine the ratio of secular and religious spending.

*See Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 2010, 138 L.Ed.2d 391 (1997) (grounds 1–4); *Lemon,* 403 U.S. at 620, 91 S.Ct. 2105 (ground 5).

In *Agostini,* the Court concluded it had rejected grounds 1 and 2 in a previous case. *See Agostini,* 117 S.Ct. at 2010 (citing *Zobrest v. Catalina Foothills Sch. Dist.,* 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993)).[6] The Court concluded it had rejected ground 3 in another case. *See id.* at 2011 (citing *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S.

---

**6.** In *Zobrest,* the Court held the school district would not violate the Establishment Clause by providing a sign-language interpreter for a deaf student attending a religious school. *See Zobrest,* 509 U.S. at 13–14, 113 S.Ct. 2462. The Court distinguished this case from *Meek* and *Ball* on two grounds: (1) the provision of an interpreter was not the type of aid the religious school would ordinarily provide, so the aid in this case was not directly subsidizing the religious education; and (2) "the task of a sign-language interpreter seems to us quite different from that of a teacher or guidance counselor" because an ethical interpreter would transmit the lesson as presented without adding to or subtracting from any religious content. *See id.* at 12–13, 113 S.Ct. 2462. However, when the Court examined this holding in *Agostini,* it stated, "The signer in *Zobrest* had the same opportunity to inculcate religion in the performance of her duties as do Title I employees." *Agostini,* 117 S.Ct. at 2011, 521 U.S. 203.

481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986)).[7] Having rejected ground 1, the Court concluded that pervasive monitoring of the teachers' lessons for religious content is no longer necessary. *See id.* at 2016. However, the Court did not hold in *Agostini* that pervasive monitoring, if required, would not constitute excessive entanglement, and it did not address ground 5 concerning monitoring a religious institution's records. *Agostini* stated the current view that government aid to religious institutions does not violate the Establishment Clause "where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Id.* at 2014.

### Free Exercise Clause

 The Free Exercise Clause prohibits "all 'governmental regulation of religious beliefs as such.'" *See Employment Div. v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (quoting *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)). The Free Exercise Clause also protects acts for religious purposes, including proselytizing. *See id.* Likewise, the Free Exercise Clause prohibits the government from intervening in a dispute concerning religious authority or dogma. *See id.* The government may not impose a regulation that would substantially burden a religious practice based on sincerely held religious beliefs unless the lack of the regulation would significantly hinder a compelling state interest. *See Sherbert,* 374 U.S. at 403, 83 S.Ct. 1790; *Tilton v. Marshall,* 925 S.W.2d 672, 677–78 (Tex.1996). Such "compelling state interests" exist when the conduct regulated would invariably pose "a substantial threat to the public safety, peace, or order." *Sherbert,* 374 U.S. at 403, 83 S.Ct. 1790.[8]

 This last prohibition bars government involvement in disputes concerning the structure, leadership, or internal policies of a religious institution. *See Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 709, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). As the Court stated, "[C]ivil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity in matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Id.* at 713, 96 S.Ct. 2372. This principle protects religious institutions from government interference in their internal management and supervision. *See Combs v. Central Tex. Annual Conference of the United Methodist Church,* 173 F.3d 343, 350 (5th Cir.1999). It also prohibits courts from considering claims by ministers against their religious organization concerning employment practices. *See*

---

7. In *Witters,* the Court held the state Commission for the Blind would not violate the Establishment Clause by providing vocational rehabilitation assistance to a student at a religious college seeking to become a pastor, missionary, or youth director. *See Witters,* 474 U.S. at 483, 106 S.Ct. 748. The Court held the state program was not a direct subsidy to a religious institution because: (1) the decision of where the money would go was the student's choice, not the state's; (2) the state program was religiously neutral on its face; and (3) nothing in the record indicates that a significant portion of the aid requested by the student goes towards religious education. *See id.* at 488, 106 S.Ct. 748.

8. To illustrate this point, the Court in *Sherbert* cited cases upholding statutes prohibiting bigamy and the transportation of women across state lines for immoral purposes, which interfered with the defendants' religious practice of polygamy; and a statute prohibiting young children from selling newspapers, which interfered with the defendants' practice of selling religious literature. *See Cleveland v. United States,* 329 U.S. 14, 17–19, 67 S.Ct. 13, 91 L.Ed. 12 (1946); *Prince v. Massachusetts,* 321 U.S. 158, 160–61, 169–71, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Jacobson v. Massachusetts,* 197 U.S. 11, 12–14, 25 S.Ct. 358, 49 L.Ed. 643 (1905); *Reynolds,* 98 U.S. at 145.

*Starkman v. Evans,* 198 F.3d 173, 175–77 (5th Cir.1999); *Bell v. Presbyterian Church,* 126 F.3d 328, 331 (4th Cir.1997); *EEOC v. Catholic Univ. of Am.,* 83 F.3d 455, 465 (D.C.Cir.1996); *McClure v. Salvation Army,* 460 F.2d 553, 560 (5th Cir. 1972).

### "Congress shall make no law ..."

Originally, the First Amendment prohibited only Congress from "mak[ing a] law" respecting an establishment of religion or prohibiting the free exercise of religion. *See* U.S. CONST. amend. I. After the ratification of the Fourteenth Amendment, the limitations on Congress in the First Amendment became equally applicable to state governments. *See Everson,* 330 U.S. at 15, 67 S.Ct. 504; *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Supreme Court has broadly interpreted the command to "make no law" as prohibiting all forms of government action, including both statutory law and court action through civil lawsuits. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 277, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Kreshik v. Saint Nicholas Cathedral,* 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960) (per curiam).

### THE TURNERS' CLAIMS

In their first two issues, the Turners question whether the trial court erred in granting the Church's motion for summary judgment on the ground that the Religion Clauses bar their causes of action. The Turners' many causes of action rely on similar factual and legal scenarios and may be broken into different groups of claims as follows: claims concerning the Church's Missionary Program, including its training program; claims concerning events following Turner's return to the United States; and claims concerning the existence of a confidential or fiduciary relationship between Turner and the Church. If these claims are barred by the First Amendment, then the Turners' causes of action comprised of these claims are likewise barred.

### The Church's Missionary Program

The majority of the Turners' claims under their various causes of action concern the activities of training missionaries and conducting a missionary program. The Turners do not contest the Church's assertion that its program of training missionaries and sending them into the world to preach its message are religious activities subject to the protection of the Religion Clauses. The Turners argue that their claims do not concern the establishment of religion or infringe upon the Church's right to the free exercise of religion.

### 1. The Establishment Clause

In the trial court, the Turners argued the Establishment Clause did not bar their suit because the claims under their various causes of action did not require excessive government entanglement with the Church. In their appellate brief, the Turners abandon their argument below and argue only that the Establishment Clause "is irrelevant in this case." They argue that the Establishment Clause is at issue only when the government provides aid to a religious institution. Although the Turners are correct that government aid to a religious institution may violate the Establishment Clause, government action that hinders a religious institution and unnecessarily entangles the government with the religious institution may also violate the Establishment Clause. In *EEOC v. Catholic University of America,* a nun sued the University for denying her tenure. The University asserted it did so because her teaching and scholarship failed to meet the required standards. *See Catholic Univ. of Am.,* 83 F.3d at 465.

The court held that determination of the ecclesiastical basis would excessively entangle the court in the religious law and practice in violation of the Establishment Clause. *See id.* at 467. The government's involvement in such an instance would not aid the church, but it would still violate the Establishment Clause. Likewise, in *Lemon,* the Supreme Court held the monitoring of the religious content of the school's teaching and spending would excessively entangle the government creating the "danger[ ] of excessive government · direction of church schools and hence of churches" in violation of the Establishment Clause. *Lemon,* 403 U.S. at 620, 91 S.Ct. 2105. Certainly the pervasive monitoring barred in *Lemon* was more a hindrance than an aid to the religious school. Step 2 of the *Lemon* test requires that the government act's "principal or primary effect must be one that neither advances *nor inhibits* religion." *Id.* at 612, 91 S.Ct. 2105 (emphasis added). Contrary to the Turners' assertions, none of the Establishment Clause cases purports to limit the application of the Establishment Clause to situations involving government aid to religious institutions. We conclude the Establishment Clause is relevant in this case.[9]

The Turners' lawsuit challenges the Church's Missionary Program, including its missionary training program. The Missionary Program's purpose—its *raison d'etre*—is to spread the Church's religious message around the world and to bring new members into the Church. *See Lemon,* 403 U.S. at 628, 91 S.Ct. 2105 (Douglas, J., concurring) ("[T]he *raison d'etre* of parochial schools is the propagation of a religious faith."). The training program's sole goal is the preparation of missionaries to preach the Church's religious message anywhere in the world. The entire Mis-

sionary Program, including the training program, is a religious activity. If the Turners were to prevail in this lawsuit, government regulation through the courts would require the Church to augment its missionary training program to teach the following subjects to its missionaries assigned to Guatemala:

1. the probability of contracting various diseases in Guatemala;

2. the hazards and perils in Guatemala due to the instability of the Guatemalan government, the people in the area, the working and living conditions, and diseases;

3. the sources, nature, types, prevention, symptoms, availability of medication for and the cure rate of diseases in Guatemala, and the effect of the diseases on one's physical and emotional states;

4. the inadequacy or limitations of medical personnel available in Guatemala;

5. the inadequacy or limitations of housing facilities provided for its missionaries in Guatemala, including the lack of screens on windows, indoor plumbing, mosquito netting, insect repellent, etc.;

6. the methods of preparing food (and avoiding certain foods) to prevent disease; and

7. that the Church would not immunize missionaries in Guatemala for malaria and yellow fever.

 Essentially, the Turners' claims allege that the Church inadequately trained Turner to be a missionary because it did not disclose the above information to him. If the courts address these alle-

9. The Turners do not define what they mean by "aid" to a religious organization. If "aid" means financial aid, then their argument must fail. A statute declaring a particular religion to be the official religion of the coun-
try but that forbade any government or private financial assistance to the religion would not necessarily aid the religion, but it would violate the Establishment Clause.

gations and find for the Turners, then the courts will be ruling that the curriculum at the missionary training program left Turner unprepared to preach the gospel in Guatemala. If the courts find for the Church, then the courts will be approving the curriculum of the training program and essentially certifying that Turner was prepared to preach the gospel in Guatemala. Either way, the courts' reaching these claims would constitute active government involvement in the religious activity of training missionaries. As the Turners note in their brief, "The Establishment Clause is to protect against state 'sponsorship, financial support, *and active involvement*' in religious activity. [Citing *Walz v. Tax Comm'n,* 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) ]." (Emphasis added.) Likewise, the courts' approval or rejection of the working and living conditions and the level of medical care available in Guatemala would actively involve the government through the courts in the Church's religious activity of operating a mission.

Unlike the neutral statutes approved in *Agostini,* the judicially imposed governmental controls the Turners seek are aimed solely at a religious institution's performance of its religious activities. *Cf. Agostini,* 117 S.Ct. at 2014 (government aid does not violate the Establishment Clause "where the aid is allocated on the basis of neutral, secular criteria that nei-

ther favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis"). The Turners' claims concerning all aspects of the Missionary Program and its training program are barred by the Establishment Clause.

## 2. The Free Exercise Clause

■ The Turners argue that their claims did not violate the Free Exercise Clause because the areas of the training program and the missionary program they seek to regulate are secular. The Turners rely on *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the issue before the Supreme Court was whether a statute generally prohibiting the use of peyote violated the right of free exercise of religion to members of the Native American Church who used peyote during religious ceremonies.[10] *See id.* at 876, 110 S.Ct. 1595. The Supreme Court determined that a statute which does not on its face prohibit the free exercise of religion but that significantly interferes with a group's practice of its religion does not violate the Free Exercise Clause. *See id.* at 882. *Smith* does not apply to this case because the Turners are not seeking to enforce a religiously neutral statute.[11] Instead, the Turners' suit seeks government regulation through the courts of the Church's religious activities of training its missionaries and sending them to

**10.** After the Supreme Court issued *Smith,* the United States Congress passed the Religious Freedom Restoration Act, which statutorily mandated the test in *Sherbert* instead of *Smith. See* 42 U.S.C.A. § 2000bb-1 (West 1994). The Texas Supreme Court relied on the Act and did not consider the applicability of *Smith* in a case involving the constitutionality of causes of action brought against a minister and his church. *See Tilton v. Marshall,* 925 S.W.2d 672, 676 n. 5, 677–78 (Tex. 1996) (orig.proceeding). After the Texas Supreme Court issued *Tilton,* the United States Supreme Court declared the Religious Freedom Restoration Act unconstitutional. *See City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997).

Therefore, the Texas Supreme Court's failure to consider the applicability of *Smith* in *Tilton v. Marshall* does not limit our consideration of the applicability of *Smith* in this case.

**11.** The *Smith* Court stated "that a State would be 'prohibiting the free exercise [of religion]' if it sought to ban such acts or abstentions only when they are engaged in for religious reasons.... It would doubtless be unconstitutional, for example, to ban the casting of 'statues that are to be used for worship purposes,' or to prohibit bowing down before a golden calf." *Smith,* 494 U.S. at 877–78, 110 S.Ct. 1595.

Guatemala to proselytize. Thus, the judicially imposed governmental controls the Turners seek are not religiously neutral, would substantially burden the Church's missionary practice, and are not supported by compelling government interests.

The Turners also rely on two other cases, *Sanders v. Casa View Baptist Church*, 134 F.3d 331 (5th Cir.), *cert. denied*, 525 U.S. 868, 119 S.Ct. 161, 142 L.Ed.2d 132 (1998); and *Dausch v. Rykse*, 52 F.3d 1425 (7th Cir.1994) (per curiam). In each case, a clergyman held himself out as a qualified marital counselor by reason of his training and experience. Each clergyman formed a counselor-patient relationship with women who sought counseling, and each clergyman committed malpractice by engaging in sexual relations with his patients. The patients sued the clergymen for professional malpractice. *See Sanders*, 134 F.3d at 334; *Dausch*, 52 F.3d at 1428. The clergymen argued their counseling sessions were protected by the Free Exercise Clause because they were not completely secular in that they would sometimes read Bible passages as part of their counseling or provide other forms of religious counseling. The Fifth and Seventh Circuits rejected this argument because the activity the men provided and held themselves out

as qualified to provide was essentially a secular professional service, namely, psychotherapy. *See Sanders*, 134 F.3d at 337; *Dausch*, 52 F.3d at 1433 (Ripple, J., concurring in part and dissenting in part, joined by Coffey, J., concurring). The Turners do not identify the essentially secular service the Church provided Turner that is subject to government regulation. Unlike the provision of medical or psychological services, which are regularly performed by secular practitioners, the only "services" the Church provided Turner were the opportunity and training to be a missionary abroad. Unlike psychotherapy services, the Church's actions were necessarily inseparable from the religious activity of its missionary work. The plaintiffs in *Sanders* and *Dausch* brought professional negligence causes of action against the clergymen. The Turners have not brought any similar cause of action. In *Dausch*, the court also explained that the government has the right to regulate activities, such as psychological, medical, and legal practices, that it deems to pose a potential public danger. *See Dausch*, 52 F.3d at 1433. The Turners do not explain, and we do not perceive, how the Church's missionary program poses a public danger warranting government regulation.[12]

*Sanders* and *Dausch* permit government regulation of the relationship between a

---

12. *Cf. Molko v. Holy Spirit Ass'n for the Unification of World Christianity*, 46 Cal.3d 1092, 252 Cal.Rptr. 122, 762 P.2d 46 (1988). In *Molko*, the members of the Unification Church would lie to prospective converts, telling them they were not involved with a religious organization or with the Reverend Moon until the converts reached a level of indoctrination that the members were sure that revealing the truth about the organization would not drive away the converts. *See id.* at 53–54. The California Supreme Court stated it is permissible for a person to submit to a process involving coercive influence, such as knowingly entering a monastery or seminary, but "quite another when a person is subjected to coercive persuasion without his knowledge or consent." *Id.* at 60. The court said the state "has a compelling interest in preventing its citizens from being deceived into submitting unknowingly to such a poten-

tially dangerous process." *Id.* The court held the church could be liable for fraud for its recruitment practices involving lying about the true nature of the church. *Id.* at 59–61. The court stated, however, that the church was not required to obtain informed consent from prospective converts and that the state's compelling interest did not "require the active dissemination of specific information about religion's nature, activities and lifestyle." *Id.* at 61.

Unlike the prospective converts in *Molko*, Turner was aware of what was happening to him: he was going to be a missionary in Guatemala. The Turners did not present summary judgment evidence showing the Church had given him any expectation that the living, working, and medical-care conditions would be different than they were. Nor did they present any evidence that the Church

professional practitioner and client, regardless of any religious affiliation or sponsorship of the practitioner and client. The claims those plaintiffs brought were not dependent on the clergymen's religious role. The Turners' claims concerning the Missionary Program and its missionary training, however, derive entirely from the Church's publicly expressed religious obligation to preach the gospel in all nations. Unlike the psychotherapy services the clergymen provided, the Turners' claims concerning the Missionary Program and its training program do not involve provision of a secular service separable from the religious activity.

As discussed above, the Free Exercise Clause requires civil courts to accept the decisions of religious organizations regarding "discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian E. Orthodox Diocese*, 426 U.S. at 713, 96 S.Ct. 2372; *see also Bell*, 126 F.3d at 331 (quoting *Serbian E. Orthodox Diocese*). Just as the government through the courts may not examine the employment decisions of a religious organization regarding its clergy, so also the courts may not examine the training provided the clergy and the conditions in which the clergy are required to perform their reli-

gious tasks. *Cf. Starkman*, 198 F.3d at 175–77 (disabled "minister" (choir director) could not bring suit against church under the Americans with Disabilities Act for terminating her without reasonable accommodation for her disabilities).

We hold the Turners have not shown the trial court erred in determining their claims concerning the Church's missionary program and missionary training program are barred by the Establishment and Free Exercise Clauses.[13]

### The Turners' Post–Mission Claims

 The Turners' remaining claims under various causes of action concern events following the termination of Turner's mission with his return to the United States:

1. the Church's canceling his health insurance and failing to pay his medical expenses "due to the wrongful or premature termination of his mission";

2. the Church's failure to timely restore his "Temple Recommend" privileges;[14]

3. the Church's obtaining his medical records without his consent and in-

---

had told him the area was disease or malaria free.

13. The parties cite only one case involving a missionary suing his religious order for injuries he suffered while a missionary, *Dowd v. Society of St. Columbans*, 861 F.2d 761 (5th Cir.1988). In *Dowd*, a priest sued his religious order for injuries he suffered while working as a missionary abroad. *See id.* at 762. He brought his suit as a breach-of-contract action. The trial court granted summary judgment for the religious order, and the priest did not appeal. *See id.* at 763. The priest later tried to bring a tort action on the same facts. The trial court granted the religious order's motion for summary judgment, which asserted res judicata. *See id.* The Fifth Circuit affirmed on the ground that res judicata barred the priest's second suit, but it noted in dicta that the priest's claims against his religious order for his injuries while a

missionary "involve rules, policies and decisions which should be left to the exclusive religious jurisdiction of the church and the Society." *Id.* at 764. Our research has failed to disclose any other cases on this issue.

14. According to the deposition of Robert Swenson, only Church members who have the status of "Temple Recommend" are permitted to enter the Church's temples. The achievement of this status is based on the members' support and testimony of the general authorities of the Church; moral worthiness; history of attendance at meetings and fulfilment of Church commitments; history of tithing; keeping the "word of wisdom" by avoiding certain activities, such as using tobacco, alcohol, or caffeine; and clearance or resolution with the priesthood leaders of any sins or misdeeds.

cluding them in his Church-membership file;

4. the Church's noting in its membership files that Turner's mission ended early due to stress caused by an emotional or mental problem or condition and its placing copies of his medical records in its membership files;

5. the Church's communicating to Turner's grandparents information in its records that his mission was terminated due to his mental or emotional condition; and

6. the Church's placing him in the behavioral science unit of the Utah Valley Regional Medical Center.

The first four claims—the termination of Turner's health insurance due to the wrongful or premature termination of his mission, the Church's obtaining copies of his medical records without his consent and including them in his Church-membership file, the Church's notation in its records concerning the reasons for the termination of Turner's mission, and the revocation of his Temple Recommend privileges—involve internal policies of the Church. The Free Exercise Clause prohibits government interference with matters of internal organization. *See Serbian E. Orthodox Diocese*, 426 U.S. at 713, 96 S.Ct. 2372; *Combs*, 173 F.3d at 349 (quoting *Catholic Univ. of Am.*, 83 F.3d at 462).

■ Under various causes of action, the Turners allege the Church harmed Turner by terminating his medical insurance "due to the wrongful or premature termination of his mission." To determine the efficacy of this claim, the courts would have to decide whether the termination of his mission was wrongful or premature. The Free Exercise Clause prohibits the courts from determining employment decisions concerning "ministers." *See Starkman*, 198 F.3d at 175–77; *Bell*, 126 F.3d at

331; *Catholic Univ. of Am.*, 83 F.3d at 465; *McClure*, 460 F.2d at 560. Whether a person is a "minister" for the purpose of determining the applicability of the "ministerial exception" to judicial review of employment decisions is a question of law. *See Starkman*, 198 F.3d at 176.

■ First, the court must determine whether employment decisions on the position at issue "are made 'largely on religious criteria.'" *Id.* (quoting *EEOC v. Southwestern Baptist*, 651 F.2d 277, 283 (5th Cir. Unit A July 1981)). Swenson, a Church member, testified in his affidavit that the missionary candidates were selected based on their religious convictions and commitment. The uncontroverted summary judgment evidence demonstrates that the Church's missionaries had to be educated in their faith and able to serve as spiritual leaders. *Cf. id.* (choir director had "to be educated in religion and serve as a spiritual leader"). Second, "the court must consider whether the plaintiff was qualified and authorized to perform the ceremonies of the Church." *Id.* (citing *Southwestern Baptist*, 651 F.2d at 284). Turner's essential tasks as a missionary were to preach the gospel to the people and perform baptisms. As a missionary, Turner was a member of the Church's clergy and used the title "Elder." We conclude Turner was a "minister" while he was a missionary. Therefore, the Free Exercise Clause bars judicial review of the Church's decision to terminate his mission. *See id.* at 177.

■ The Turners allege under various causes of action that the Church harmed Turner by revoking his Temple Recommend. A member's eligibility to this privilege is based on the individual's history of adherence to Church doctrine, moral worthiness, attendance at Church meetings, fulfilment of Church commitments, support and testimony of the general authorities of the Church, etc. Turner alleged the

Church revoked his Temple Recommend because he filed this lawsuit. However, he testified that his "disfellowship" was originally caused by his and Nicole's premarital sexual activity. Regardless of the reason, the decision to revoke the Temple Recommend is an internal matter based on the Church's religious doctrine, and the Turners' allegations cannot be determined "without an inquiry into and evaluation of the Mormon religion. . . . Such a determination by a court is prohibited under the First Amendment." *Davis v. Church of Jesus Christ of Latter Day Saints*, 258 Mont. 286, 852 P.2d 640, 647 (1993).

 Under various causes of action, the Turners allege the Church harmed Turner by obtaining copies of his medical records without his consent and including them in its Missionary Program files. They also allege the Church harmed Turner by noting in his Church-membership file that his mission was terminated due to stress caused by an emotional or mental problem or condition. The summary judgment evidence shows the Missionary Program file was one the Church kept for tracking its missionaries. These files are routinely destroyed after the mission is concluded. The Church's representative testified at his deposition that he searched the Missionary Program's records before his deposition and could not find any file on Turner. He testified that the destruction of the records on Turner would have been in accordance with the Missionary Program's record-retention plan. The Church's record keeping on its missionaries is part of its Missionary Program. As discussed above, government interference with this part of the religious activity of the Missionary Program is barred by the Establishment and Free Exercise Clauses. *See Decker v. Tschetter Hutterian Brethren*, 594 N.W.2d 357, 363 (S.D.1999) (discussing *Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468, 470 (8th Cir.1993)). As for the Turners' allegations concerning

Turner's Church-membership file, the content of the Church's membership records is a matter of internal policy; thus, its regulation is barred by the Free Exercise Clause. *See Serbian E. Orthodox Diocese*, 426 U.S. at 713, 96 S.Ct. 2372.

 The Turners alleged in their defamation cause of action that the Church harmed Turner by communicating information in its records regarding his mental condition to persons outside his immediate family. Although the First Amendment prohibits government regulation of the information a religious organization chooses to record concerning its members, the government may regulate the organization's use of that information if the regulation would not actively involve the government in the organization's internal affairs, religious practice, or religious doctrine. The Church does not explain, and we do not perceive, how the communication of Turner's mental condition to his grandparents concerns the internal policies of the Church or matters of faith or ecclesiastical doctrine. Nor does the Church explain how resolution of this claim would actively involve the government in the Church's religious activities or excessively entangle the government with religion. *See Drevlow*, 991 F.2d at 471–72 (claims for false information contained in Church's files were barred by First Amendment, but claims against Church for disclosing false information in its files were not barred by First Amendment). We conclude this cause of action is not barred by the First Amendment.

 The Turners alleged under various causes of action that the Church harmed Turner by placing him in the behavioral science unit of the Utah Valley Regional Medical Center. The only causes of action under which they appeal this claim are their false imprisonment and intentional infliction of emotional distress causes of action. Their failure to assert

this claim on appeal under any of the other causes of action alleging this claim waives this claim under those causes of action.[15] *See Dennis,* 989 S.W.2d at 28. Accordingly, this claim is before us under the Turners' causes of action for false imprisonment and intentional infliction of emotional distress only. This claim is not barred by the First Amendment because it does not involve the internal policies of the Church or matters of faith or ecclesiastical doctrine, and it does not actively involve the government in the Church's religious activities or excessively entangle the government with religion.

### Confidential or Fiduciary Relationship

 In their causes of action for fraud and breach of fiduciary duty, the Turners claim a confidential relationship existed between Turner and the Church, creating a fiduciary duty by the Church to Turner, and leaving the Church obligated to disclose information to Turner. Determination of the existence of a confidential or fiduciary relationship requires examination of the relationship between the parties. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex.1992). In their response to the Church's motion for summary judgment, the Turners assert the following facts show the existence of a confidential or fiduciary relationship:

Turner's life-long membership in the Church;

his activities in the Church, including tithing, membership in the priesthood, performance of religious ceremonies, and his callings as an officer in different Church organizations;

his moral standing in the Church, including his pledge of allegiance to the Church, its leaders and teachings, and his Temple Recommend;

the Church's requirement that he confess his transgressions and the fact he did confess his transgressions concerning premarital sex and discord within his family;

the Church's appointment of him to be its missionary and "an official representative of the ... Church," as well as the Church's requirement that he "maintain the highest standards of conduct and appearance by keeping the commandments and following the counsel of [his] mission president"; and

the Church's promise to transport him to and from his mission, to train him for his mission, and its control over his lifestyle at the Missionary Training Center.

All of these facts involve either religious doctrine and practices or the internal policies of the Church. Thus, determination of whether a confidential or fiduciary relationship exists would require the courts to interpret religious doctrine, practices, and the internal policies of the Church. Making such an examination of the relationship between the Church and its missionaries would necessarily involve excessive entanglement by the government with the Church in violation of the Establishment Clause. *See Dausch,* 52 F.3d at 1438 (Ripple, J., concurring in part and dissenting in part, joined by Coffey, J., concurring); *Doe v. Evans,* 718 So.2d 286, 293 (Fla.Dist. Ct.App.1998), *review granted,* 735 So.2d 1284 (Fla.1999); *H.R.B. v. J.L.G.,* 913

---

15. The claim was waived for failure to brief in the Turners' causes of action for conspiracy to commit false imprisonment, breach of fiduciary duty, negligence, negligent breach of contract, breach of contract, and breach of warranties. The Turners discussed the false imprisonment claim in their brief under their cause of action for fraud, but their arguments required the existence of a confidential or fiduciary relationship. As discussed below, the First Amendment bars the courts from determining whether such a relationship exists.

S.W.2d 92 (Mo.App.1995).[16] Accordingly, we conclude that the Turners' claims that a confidential or fiduciary relationship exists between the Church and Turner are barred by the First Amendment.

### Conclusion

We conclude that all of the Turners' claims alleged under their various causes of action are either waived for failure to brief on appeal or are barred by the First Amendment except: (1) their claim under their false imprisonment and intentional infliction of emotional distress causes of action concerning Turner's placement in the behavioral science unit of the Utah Valley Regional Medical Center; and (2) their claim under their defamation cause of action concerning the Church's release of information in Turner's missionary file to his grandparents. Accordingly, we resolve the Turners' first two issues in their favor in part and against them in part.

The Church moved for summary judgment on these remaining causes of action on the basis of no evidence.

### SUMMARY JUDGMENT: RULE 166a(i)

After adequate time for discovery and without presenting summary judgment evidence, a party is permitted by rule of civil procedure 166a(i) to move for summary judgment on the ground that no evidence supports one or more essential specified elements of an adverse party's claim or defense on which the adverse party would have the burden of proof at trial. *See* Tex.R. Civ. P. 166a(i). If the adverse party is unable to produce summary judgment evidence raising a genuine issue of material fact on the challenged elements, the trial court must grant the motion. *See id.*

A no-evidence motion for summary judgment is essentially a pretrial motion for instructed verdict, and we apply the same standard of review. *See Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied); *see also General Mills Restaurants, Inc. v. Texas Wings, Inc.,* 12 S.W.3d 827, 832–33 (Tex.App.-Dallas 2000, no pet.); *cf. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (federal summary-judgment rule mirrors the standard for instructed verdict). We consider all the evidence in the light most favorable to the adverse party, disregarding all contrary evidence and inferences. *See Sibai v. Wal–Mart Stores, Inc.,* 986 S.W.2d 702, 705 (Tex.App.-Dallas 1999, no pet.); *Moore,* 981 S.W.2d at 269. A no-evidence summary judgment is improper if the adverse party has produced more than a scintilla of probative evidence raising a genuine issue of material fact on each challenged element of a claim or defense. *See Roth v. FFP Operating Partners, L.P.,* 994 S.W.2d 190, 195 (Tex.App.-Amarillo 1999, pet. denied); *Moore,* 981 S.W.2d at 269. Evidence that "is so weak as to do no more than create a mere surmise or suspicion"

---

**16.** The Turners argue that *Sanders v. Casa View Baptist Church,* 134 F.3d 331 (5th Cir. 1998), supports their claim that a fiduciary duty exists from the Church to Turner. *Sanders* involved a priest's sexual misconduct during a marital counseling session with a parishioner. The Fifth Circuit held the *priest owed the parishioner a fiduciary duty because of the counselor-patient relationship.* The Fifth Circuit reached this conclusion without having to consider the church's religious principles. *See id.* at 337. The court never considered whether the church owed a fiduciary duty to the parishioner.

The Turners also argue on appeal that a fiduciary relationship exists from a doctor-patient relationship between the Church and Turner. The Turners argue a doctor-patient relationship exists because one of the doctors and the nurse who treated Turner in Guatemala were also Church missionaries. The Turners did not assert this fact under this cause of action in their response to the Church's motion for summary judgment. Accordingly, this issue cannot be considered as grounds for reversal. *See* Tex.R. Civ. P. 166a(c); *Clear Creek Basin Auth.,* 589 S.W.2d at 678.

of a fact is legally insufficient and constitutes no evidence. *See Moore*, 981 S.W.2d at 269 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)). "More than a scintilla of evidence exists when the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Moore*, 981 S.W.2d at 269 (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997), *cert. denied*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998)).

### False Imprisonment

■ In their fifth issue, the Turners question whether the trial court erred in determining no evidence supports their cause of action for false imprisonment. This cause of action is based on their allegation that the Church placed Turner in the behavioral science unit of Utah Valley Regional Medical Center.

The summary judgment evidence shows the Church arranged for Turner's transportation to the Utah Valley Regional Medical Center. The evidence shows the Church was not affiliated with the Utah Valley Regional Medical Center and that it was not involved in the Utah Valley Regional Medical Center's decision to place Turner in the behavioral science unit. On arrival at the hospital, Turner signed a form consenting to "medical treatment." [17] An inference arises from the evidence that the Church reported to the hospital staff the facts leading to the Church's decision to take Turner to the psychiatric wing of the hospital. Turner's own affidavit shows he believed he was admitted and consented to treatment for physical symptoms and the "illness(es) causing them" and that no one told him he was being admitted for psychiatric care. Turner does not state in his affidavit or deposition that any person affiliated with the Church assisted him in registering or admitting himself, or persuaded him to admit himself.

Turner stated in his affidavit that he was not allowed to leave the behavioral science unit for an unspecified period of time and that he was forced to take psychiatric tests and to participate in psychiatric therapy.[18] Although Turner stated in his

17. Although the Turners attempt to distinguish between "psychiatry" and "medicine," they overlook the fact that psychiatry is a branch of medicine. *See, e.g.*, STEDMAN'S MEDICAL DICTIONARY 1284 (25th ed.1990) (defining "psychiatry" as "The medical specialty concerned with the diagnosis and treatment of mental illnesses."); 12 OXFORD ENGLISH DICTIONARY 758 (2d ed.1989) (defining "psychiatry" as "The medical treatment of diseases of the mind."); 22 ENCYCLOPEDIA AMERICANA 717 (1984) ("Psychiatry is a medical specialty concerned with the diagnosis, treatment, and prevention of mental illness...."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1832 (1981) (defining psychiatry as "A branch of medicine that deals with the science and practice of treating mental, emotional or behavioral disorders...."); 11 ENCYCLOPÆDIA BRITANNICA 844 (1979) ("The main specialties are ... [i]n medicine ... psychiatry."). Even the word "psychiatry" is inseparable from medicine. The word contains two Greek roots: Ψυχη, which transliterates as and means "psyche," and ιατρεια, which transliterates as "iatria" and means healing or medical arts. *See* 12 OXFORD ENGLISH DICTIONARY

758. Therefore, even though Turner may not have understood the meaning of the term "medical treatment," his consent to medical treatment necessarily included psychiatric treatment.

18. The only direct testimony from Turner concerning any detention in the hospital was in paragraph 40 of his affidavit:

The hospital staff in the behavioral science unit where I was placed confiscated most of my personal property [including a machete Turner brought back from Guatemala] and placed me in a small room near a nurse's station. *I was not permitted to leave the unit when I tried to do so.* I was not permitted to make a telephone call to my parents. It was another day or two before I was permitted to make a telephone call to my parents. I became aware that I was in the mental ward. I was made to take written tests and to attend a group therapy session. I was not cooperative with them and refused to attend any additional group sessions or to take any additional written tests. I was also given a physical examination and some blood was taken from me.

affidavit that he "was not permitted to leave the unit when [he] tried to do so,"[19] the evidence does not show that Turner ever demanded and was refused a transfer from the behavioral science unit to another section of the hospital or that he ever demanded and was refused discharge from the hospital. Although Turner complained of his care, he presented no evidence that he wanted to leave the hospital.

■ To prove false imprisonment, the Turners had to show: (1) the Church willfully directed, requested, or participated in Turner's detention; (2) without Turner's consent; and (3) without authority of law. *See Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex.1985) (per curiam); *Smith v. Sneed*, 938 S.W.2d 181, 185 (Tex. App.-Austin 1997, no writ); *Bossin v. Towber*, 894 S.W.2d 25, 29 (Tex.App.-Houston [14th Dist.] 1994, writ denied). The Church argued, amongst other grounds, that no evidence showed it was involved in any willful detention of Turner in the behavioral science unit.

The Turners state in their brief, "It was the Church that admitted Jon Turner to Utah Valley Regional Medical Center on an emergency basis, and that determined that he required psychiatric treatment." The Turners cite to one page of the notes of Dr. Stanley Abbott, a doctor at the Utah Valley Regional Medical Center, and to one page of the deposition of Robert Swenson, a member of the Church.

Dr. Abbott's notes indicate Turner "was referred here by his mission president." Evidence that the Church *referred* Turner to the hospital is not evidence the Church *admitted* him to the hospital. Dr. Abbott's notes contain no indication the Church "admitted" Turner to the hospital or that it had any authority to do so. Dr. Abbott's

notes also state the mission "indicate[d] that the patient actually jumped off the bus and tumbled on the ground after landing, he had been acting strange, that he was afraid of people and that he has anxiety attacks." The Church's reporting of Turner's behavior during his mission to the hospital medical staff is not evidence the Church "determined that he required psychiatric treatment."

■ The cited page of Swenson's deposition indicates that Turner's transportation to the hospital was arranged by a member of the Church's Missionary Department, Glen VanWagenen. Swenson testified that VanWagenen drove Turner to the hospital and escorted him to the psychiatric area of the hospital. Swenson testified he had no knowledge of the extent of any contact and communication between VanWagenen and the hospital medical staff. Swenson did not testify, and the Turners did not produce evidence showing, that VanWagenen had any authority to admit Turner to the hospital or that VanWaganen had determined that Turner required psychiatric treatment. Thus, Swenson's deposition does not support the Turners' assertion that the Church admitted Turner to the hospital and determined he required psychiatric treatment. "An appellant bears the burden of discussing its assertion of error and pointing the appellate court to the portions of the record that support a complaint." *Jensen Constr. Co. v. Dallas County*, 920 S.W.2d 761, 769 (Tex.App.-Dallas 1996, writ denied); *see also* Tex.R.App. P. 38.1(h). The Turners have failed to meet this burden.

■ Even if this evidence supports a conclusion that "the Church *admitted* Jon Turner to Utah Valley Regional Medical Center on an emergency basis, and . . .

(Emphasis added.)

19. Turner's grandfather testified in his deposition that Turner told him he wanted to leave the unit to purchase a "Coke," but the nurses told him they would get it for him and he was not to leave.

determined that he required psychiatric treatment," (emphasis added) that evidence does not show, and Turner does not argue, that the Church directed, requested, or participated in any *detention* by the hospital of Turner against his will. Instead, the Turners' evidence shows only that the Church was concerned with Turner's psychiatric well-being and that it arranged transportation for him to a psychiatric hospital. The Turners' evidence does not show the Church obtained or sought an involuntary commitment of Turner or instructed the hospital to detain Turner in the hospital against his will. The Turners' evidence shows the Church reported information to the hospital regarding Turner's mental health—the bus incident and his reports of depression—but no evidence shows the Church directed, requested, or participated in the hospital's holding Turner against his will.[20] *Cf. Dayton Hudson Corp. v. Eldridge,* 742 S.W.2d 482, 488 (Tex.App.-Dallas 1987, writ denied) (liability for false arrest requires evidence the defendant "requested or directed" arrest; mere reporting of facts leading to arrest is insufficient).

⬛ The Turners also argue that the Church violated Utah law by holding Turner against his will for psychiatric treatment for more than twenty-four hours. *See* Utah Code Ann. § 62A–12–222 (1997);[21] *see also id.* § 62A–12–232 (procedures for involuntary commitment to local mental health authority). This provision is limited to the placing of a person in the custody of a "local mental health au-

thority." *Id.* at § 62A–12–222. The Turners' argument fails for two reasons. First, as discussed above, no evidence shows the Church held Turner for psychiatric treatment against his will. Second, no evidence shows the Utah Valley Regional Medical Center is a "local mental health authority," which is defined in the Utah Code as meaning, "a county legislative body."[22] *Id.* § 62A–12–101(4).

Because no evidence shows the Church directed, requested, or participated in any detention of Turner in the behavioral science unit, the trial court did not err in granting the Church's no-evidence motion for summary judgment on the Turners' false imprisonment cause of action. We resolve the Turners' fifth issue against them.

## Intentional Infliction of Emotional Distress

⬛ In their sixth issue, the Turners question whether the trial court erred in determining no evidence supports their cause of action for intentional infliction of emotional distress. To prove intentional infliction of emotional distress, the Turners had to show: "(1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 611 (Tex.1999). The Turners' sole remaining claim under this cause of action concerns the Turners' allegation that the

---

**20.** The issue of whether the hospital and its staff may have falsely imprisoned Turner is not before us.

**21.** The provision states:

Any person who attempts to place another person in the custody of a local mental health authority contrary to the provisions of this part is guilty of a class B misdemeanor, in addition to liability in an action

for damages, or subject to other criminal charges.

Utah Code Ann. § 62A–12–222 (1997).

**22.** The summary judgment evidence shows the hospital is "an independent not-for-profit hospital, owned and operated by Intermountain Health Care and under the direction of a Board of Governors." The Turners did not produce evidence showing the hospital is, or is affiliated with, a county legislative body.

Church placed Turner in the behavioral science unit of the Utah Valley Regional Medical Center and was responsible for his detention against his will in the behavioral science unit.

The Church asserted in its motion for summary judgment that no evidence showed it had placed Turner in the behavioral science unit of the Utah Valley Regional Medical Center or had detained him there against his will. As explained in our discussion of the Turners' false imprisonment cause of action, the Turners did not present any evidence showing the Church placed Turner, or was responsible for his placement, in the behavioral science unit of the Utah Valley Regional Medical Center or detained him there against his will.

The Church also argued in its motion for summary judgment that the record contains no evidence that its actions were extreme and outrageous. As discussed above, the Church's actions consisted of transporting Turner to a psychiatric hospital and reporting to the hospital staff the events leading to its decision to take him there. These actions are not extreme or outrageous, absent evidence of abduction of the individual or fabrication of the events reported to the hospital staff. The Turners do not cite evidence of abduction or fabrication. Instead, the record shows Turner's missionary companion reported his concerns to the mission president, who reported these concerns to the Missionary Program in Utah, which reported them to the treating doctors. Even if the Church's concerns for Turner's mental health were unjustified, the act of reporting its concerns to the hospital's medical staff is not extreme or outrageous conduct. To hold otherwise would leave every individual who seeks to help another having apparent psychiatric problems open to liability for intentional infliction of emotional distress.

We hold the trial court did not err in granting the Church's no-evidence motion

for summary judgment on the Turners' cause of action for intentional infliction of emotional distress. We resolve the Turners' sixth issue against them.

## Defamation

■ In their eighth issue, the Turners question whether the trial court erred in determining no evidence supports their cause of action for defamation. In their brief, the Turners argue that non-relatives "were able to walk in off the street in Salt Lake City and obtain information—false information—from the Church about [his] hallucinations and subsequent hospitalization for psychiatric care." Turner's grandfather testified the missionary department checked its computer and told him "things like Jon was scared, he hallucinated." Turner's grandmother testified the missionary department checked its computer and told her "Jon had hallucinated, or had been hallucinating and that he was frightened."

■ To prove defamation, the Turners had to show the Church published a false statement and was negligent about the truth of the statement. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (Vernon 1997); *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1358, 143 L.Ed.2d 519 (1999). One of the Church's grounds for summary judgment was no evidence showed the information in its records was false. The Turners, as the appellants in this case, have the burden of citing the Court to the portions of the record supporting their argument. *See* Tex.R.App. P. 38.1(h); *Jensen Constr. Co.*, 920 S.W.2d at 769. In their discussion of this issue in their brief, the Turners do not cite any evidence showing the information is false. Accordingly, we conclude the Turners have not shown the trial court erred in granting the Church's no-evidence motion for summary judgment on their defamation cause

of action. We resolve the Turners' eighth issue against them.

Having resolved these issues, we hold the trial court did not err in granting the Church's no-evidence motion for summary judgment against the Turners.

Because the third, fourth, seventh, and ninth issues are not necessary for the disposition of this appeal, we do not reach them.[23] *See* TEX.R.APP. P. 47.1.

We affirm the trial court's judgment.

---

**23.** The causes of action for breach of fiduciary duty and fraud required the existence of a confidential or fiduciary relationship. As discussed above, judicial determination of the existence of such a relationship is barred by the First Amendment. Accordingly, we need not reach the Turners' fourth and ninth issues. In their cause of action for invasion of privacy, the Turners' only claims concerned the Church's record keeping. As discussed above, these claims are barred by the First Amendment. Accordingly, we need not reach the Turners' seventh issue. Having determined that the Turners' intentional tort claims are barred by the First Amendment or are unsupported by evidence, we need not reach the third issue concerning damages.