**REVERSE and REMAND in part; AFFIRMED and Opinion Filed November 30, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00378-CV**

**MARVELLA LOYA, Appellant**
**V.**
**HICKORY TRAIL HOSPITAL, L.P., Appellee**

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-02031**

## OPINION

Before Justices Pedersen, III, Goldstein, and Smith
Opinion by Justice Goldstein

In thirteen issues, appellant Marvella Loya appeals the trial court's final summary judgment granted in favor of appellee Hickory Trail Hospital, L.P. (Hickory). We affirm in part, reverse in part, and remand this case for proceedings consistent with this opinion.

## BACKGROUND

The parties were previously before this Court on appeal from the denial of Hickory's motion to dismiss pursuant to the Texas Medical Liability Act (TMLA). *See Hickory Trail Hosp., L.P. v. Loya*, No. 05-16-00453-CV, 2016 WL 7376559

(Tex. App.—Dallas Dec. 20, 2016, pet. denied) (mem. op.) (*Hickory I*). Because the parties are familiar with the facts and we recited them in *Hickory I*, we will not recite them at length here except as necessary for context and the disposition of this appeal.

On February 25, 2013, Loya went to an inpatient mental-health facility operated by Hickory seeking dosage advice and related counseling services regarding potential side effects of medication prescribed by her personal physician to treat depression. Loya completed intake paperwork and was assessed by Angela Marquart, an LPC-Intern.[1] Thereafter, Loya alleges, Hickory admitted her without her consent, and she was not permitted to leave the facility. Marquart proceeded to fill out and file a temporary application for court-ordered mental-health services that included a "Physician's Certificate of Medical Examination for Mental Illness." Dr. Rupinder Bhatia signed the certificate, which included a statement that he evaluated and examined Loya.

Based upon the application, the mental-health court issued an order detaining Loya at Hickory's facility pending a probable cause hearing. On February 28, 2013, at the probable cause hearing, the mental-health court found that Loya did not present a substantial risk of serious harm to herself and ordered her immediate release. Loya was returned to the facility and was released "against medical advice" several hours later.

---

[1] Marquart had met with Loya ten days earlier and recommended an "Adult Partial Hospitalization Program" that Loya chose not to attend.

Loya sued Hickory for false imprisonment and unconscionable conduct under the Texas Deceptive Trade Practices Act (DTPA), alleging her detention was unlawful.

On remand after *Hickory I*, the parties continued with litigation and pre-trial proceedings. Hickory filed three motions for summary judgment. The trial court granted then vacated the judgment on the first two summary-judgment motions. Hickory then filed its third motion for summary judgment, which incorporated the grounds asserted in the first two motions and added additional grounds. The trial court granted the third motion in a final summary judgment, in which the court acknowledged that the motion encompassed Hickory's previous motions and stated that it considered Loya's response and her responses to the previous summary-judgment motions. The final summary judgment dismissed all of Loya's claims and causes of action against Hickory with prejudice. This appeal followed.[2]

## DISCUSSION

### I. STANDARD OF REVIEW AND SUMMARY JUDGMENT STANDARD

We review summary judgments de novo. *De La Cruz v. Kailer*, 526 S.W.3d 588, 592 (Tex. App.—Dallas 2017, pet. denied). When, as here, the trial court does

---

[2] Loya contends, and we agree, that for purposes of our analysis all three motions for summary judgment and responses thereto are before us. Not only did Hickory incorporate the grounds of the first two motions into the third, but the trial court itself in entering final judgment considered all prior motions and responses thereto. *See Pollard v. Hanschen*, 315 S.W.3d 636, 639 n.1 (Tex. App.—Dallas 2010, no pet.) (when a summary-judgment motion incorporates grounds asserted in one or more prior motions, the previously asserted grounds are properly before the trial court). Because we must affirm on any meritorious ground that was properly before the trial court, we too must consider all three motions. *De La Cruz v. Kailer*, 526 S.W.3d 588, 592 (Tex. App.—Dallas 2017, pet. denied).

not specify the basis for its ruling, a summary judgment must be affirmed if any of the grounds on which judgment is sought is meritorious. *Id.*

After adequate time for discovery, a party may move for no-evidence summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). To defeat summary judgment, the nonmovant must produce summary-judgment evidence that raises a genuine issue of material fact on each of the challenged elements. *Id.* We review no-evidence summary judgments under the same legal-sufficiency standard as directed verdicts. *De La Cruz*, 526 S.W.3d at 592. Under that standard, we view the evidence in the light most favorable to the nonmovant, indulge all inferences in the nonmovant's favor, credit evidence that a reasonable jury could credit, and disregard contrary evidence and inferences unless a reasonable jury could not. *Id.* We sustain a no-evidence challenge when "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Id.*

Under the traditional summary-judgment standard, the movant has the burden to show there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Vince Poscente Int'l, Inc. v. Compass Bank*, 460 S.W.3d 211, 213–14

(Tex. App.—Dallas 2015, no pet.). In deciding whether there is a disputed fact issue precluding summary judgment, we take evidence favorable to the nonmovant as true, indulging every reasonable inference in favor of the nonmovant; we resolve any doubts in the nonmovant's favor. *Id.* at 214. Once the movant establishes its right to summary judgment as a matter of law, the burden shifts to the nonmovant to present evidence raising a genuine issue of material fact, thereby precluding summary judgment. *Id.* A genuine issue of material fact exists if the nonmovant produces more than a scintilla of probative evidence regarding the challenged element. *Ward v. Stanford*, 443 S.W.3d 334, 342 (Tex. App.—Dallas 2014, pet. denied). A defendant is entitled to traditional summary judgment if it conclusively disproves at least one essential element of the plaintiff's claim or conclusively establishes every element of an affirmative defense. *Id.*

When an appeal involves review of both traditional and no-evidence grounds challenging the same element, we consider the no-evidence challenge first because evidence that defeats the no-evidence challenge will defeat the traditional challenge as well. *See Arredondo v. Techserv Consulting & Training, Ltd.*, 567 S.W.3d 383, 390 (Tex. App.—San Antonio 2018), *aff'd in part and rev'd in part on other grounds*, 612 S.W.3d 289 (Tex. 2020). If, however, the traditional motion challenges a cause of action on a ground independent of the elements of the cause of action, we consider that issue first because a review of the evidence is unnecessary if the claim is barred as a matter of law. *Id.*

## II.  ANALYSIS

Hickory asserted thirteen grounds for summary judgment in its three motions. Although Loya asserts thirteen issues on appeal,[3] there is not a one-to-one correlation between her issues and Hickory's summary-judgment grounds. The following is a list of Hickory's asserted grounds for summary judgment, each followed in parentheses by the issue in which Loya addresses it:

(1)  There was no evidence of willful detention, the first element of false imprisonment (no enumerated issue, but discussed in the body of Loya's brief);

(2)  There was no evidence of lack of consent, the second element of false imprisonment (no enumerated issue, but discussed in the body of Loya's brief);

(3)  There was no evidence of lack of authority or justification, the third element of false imprisonment (Issues 1–7);

(4)  There was no evidence of bad faith or unreasonable acts to overcome the presumption of Hickory's immunity under Section 571.019 of the Texas Mental Health Code (TMHC) (Issue 11);

(5)  The TMLA bars Loya's false-imprisonment claim because it was improperly pleaded (Issue 8);

(6)  The TMLA bars Loya's DTPA claim because it was improperly pleaded (Issue 8);

(7)  Section 74.004 of the TMLA bars Loya's DTPA claim (Issue 9);

(8)  Section 17.49 of the DTPA bars Loya's DTPA claim (Issue 10);

---

[3] Hickory restates Loya's thirteen issues as seven consolidated issues.

(9)     Hickory conclusively negated lack of authority, the third element of false imprisonment, by complying with Chapter 572 of the TMHC (Issues 1–7);

(10)    Hickory conclusively negated causation between its alleged breach and Loya's alleged damages (Issue 12);

(11)    Hickory conclusively established the judicial-proceedings privilege, partially barring both of Loya's claims (Issue 13);

(12)    Hickory conclusively negated lack of authority, the third element of false imprisonment, by complying with the order of protective custody (Issues 1–7); and

(13)    Hickory conclusively established its immunity under Section 571.019 of the TMHC (Issue 11).

Because Issues 8–10 address traditional summary-judgment grounds (i.e., grounds 5–8 above) that are independent of the elements of any claim or defense, we will discuss them first. *See Arredondo*, 567 S.W.3d at 390. Subsection (A) will address whether Loya's DTPA claim is barred as a matter of law; Subsection (B) will address whether Loya's false-imprisonment claim is barred as a matter of law. We will then address the no-evidence challenge to the elements of Loya's false-imprisonment claim (grounds 1–3), with the understanding that some evidence on any element will defeat a corresponding traditional ground as well (i.e., grounds 9 & 12). *See id.* Thus, Subsection (C) will address Issues 1–7, which focus largely on the lack-of-authority element of false imprisonment. Next, in Subsection (D), we will address Issue 12 (ground 10), whether Hickory conclusively negated causation. Finally, we will discuss Hickory's affirmative defenses of immunity and the judicial-

proceedings privilege. Subsection (E) will address Issue 11 (grounds 4 & 13), and Subsection (F) will address Issue 13 (ground 11).

## A. Whether the TMLA Bars Loya's DTPA Claim as a Matter of Law (Issues 9-10)

Loya asserted a DTPA claim alleging that Hickory engaged in an unconscionable action or course of action. Section 17.50(a) of the DTPA provides that "[a] consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: . . . (3) any unconscionable action or course of action by any person[.]" TEX. BUS. & COM. CODE ANN. § 17.50(3). The DTPA defines "Unconscionable action or course of action" to mean "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." *Id.* § 17.45(a)(5).

Hickory's summary-judgment grounds related to Loya's DTPA claim include the following: (1) the DTPA claim is barred under Section 74.004 of the TMLA; and (2) the DTPA claim is barred by the professional-services exemption of the DTPA. We do not reach the latter issue because we conclude that Section 74.004 of the TMLA bars Loya's DTPA claim.

Section 74.004 of the TMLA provides that "[n]otwithstanding any other law, Sections 17.41–17.63, Business & Commerce Code, do not apply to physicians or health care providers with respect to claims for damages for personal injury or death resulting, or alleged to have resulted, from negligence on the part of any physician

–8–

or health care provider." TEX. CIV. PRAC. & REM. CODE ANN. § 74.004(a). Loya argues that this provision does not apply because her DTPA claim is based on Hickory's intentional acts, not its negligence. Hickory argues that irrespective of how Loya pleaded her DTPA claim, it invokes the applicable standard of care and is therefore covered by Section 74.004.

Both parties rely on the supreme court's opinion in *Sorokolit v. Rhodes*, 889 S.W.2d 239 (Tex. 1994). The issue in *Sorokolit* was whether the predecessor statute[4] to Section 74.004 barred DTPA claims for knowing misrepresentation and breach of express warranty. *See id.* at 240. In construing the statutory language, the Court applied the common law meaning of "negligence"—breach of the accepted standard of medical care that proximately causes damages. *Id.* at 242. Using that definition, the Court held:

> There can be no DTPA claim against a physician for damages for personal injury or death if the damages result, or are alleged to result, from the physician's negligence; however, if the alleged DTPA claim is not based on the physician's breach of the accepted standard of medical care, [Section 74.004] does not preclude suit for violation of the DTPA.

*Id.* Applying that standard to the claims before it, the Court explained that Rhodes's claims for knowing misrepresentation and breach of express warranty were not based on Dr. Sorokolit's deviation from the accepted standard of care. Rather, Rhodes alleged that Dr. Sorokolit expressly guaranteed the results of his surgery and

---

[4] TEX. REV. CIV. STAT. ANN. art. 4590i, § 12.01(a), repealed and recodified as amended by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

knowingly misrepresented the results he could achieve. *See id.* at 242. The Court held that the exception did not apply because each of Rhodes's claims, "by its nature, concerns intentional deception and intentional breach of express guarantees." *Id.* at 242–43.

Under *Sorokolit*, a plaintiff may not recast her negligence claim as a DTPA claim to avoid the TMLA's provisions. *Id.* at 242. Hickory argues that is what Loya has done here. We agree. Unlike in *Sorokolit*, in which misrepresentation and express-warranty claims under the DTPA were at issue, Loya's DTPA claim is based on the unconscionable-acts provision. *See* TEX. BUS. & COM. CODE ANN. § 17.50(a)(3). A plaintiff asserting this type of DTPA claim need not prove that the defendant acted with knowledge or intent. *See Chastain v. Koonce*, 700 S.W.2d 579, 582 (Tex. 1985) (citing TEX. BUS. & COM. CODE ANN. § 17.50(b)(1)) ("Knowledge or intent alone cannot . . . be the distinguishing factor of unconscionability, because the DTPA specifically provides for special damages if a consumer can show that the deceptive or misleading act was committed knowingly."). Because an unconscionable-act claim does not include a scienter element, Loya's allegation that Hickory acted intentionally is irrelevant for the purposes of TMLA Section 74.004. What matters is whether Loya's DTPA claim is based on Hickory's breach of the accepted standard of medical care. *See Sorokolit*, 889 S.W.2d at 242.

The gravamen of Loya's DTPA claim is that Hickory took advantage of her by admitting her as an inpatient despite her seeking only a change to her prescription.

–10–

Loya cannot maintain such a claim without reference to Hickory's standard of care. *See Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 849 (Tex. 2005) ("[I]f the act or omission that gave rise to the claim is so integral to the rendition of medical services by the provider to be an inseparable part of those services, it constitutes a breach of the standard of care applicable to health care providers and is governed by the [TMLA]."). Loya herself has effectively conceded this point. In another section of her brief, she "acknowledges that [her false-imprisonment] claim is also a health care liability claim" and that her "DTPA claim arises out of the same facts that support her claim of false imprisonment." Under the TMLA, "health care liability claim" is defined as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed *departure from accepted standards of medical care*, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (emphasis added). Because Loya's DTPA claim is premised on Hickory's alleged departure from accepted standards of medical care, it is covered, and consequently barred, by Section 74.004 of the TMLA. *See Mem'l Hermann Hosp. Sys. v. Kerrigan,* 383 S.W.3d 611, 614 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see also Hickory I*, 2016 WL 7376559, at *1.

We overrule Loya's ninth issue and do not reach her tenth issue. *See* TEX. R. APP. P. 47.1. We affirm the trial court's judgment as to Loya's DTPA claim.

–11–

**B. Whether the TMLA Bars Loya's False-Imprisonment Claim as a Matter of Law (Issue 8)**

In her eighth issue, Loya contends that the trial court erred to the extent it granted summary judgment on the ground that the TMLA does not allow health care liability claims to be pleaded as intentional torts. Hickory argues that Loya misapprehends Hickory's argument on this point and that it has "never taken the position that intentional torts cannot be health care liability claims." Hickory contends that the trial court addressed this issue in its interim summary-judgment ruling and "ordered Loya to address the standard of care aspect of her claim, along with proximate causation."[5]

For guidance, we will review the summary-judgment grounds actually asserted in the motion and on which the trial court may have based its ruling. In its first motion for summary judgment, Hickory argued that Loya's "claim of false imprisonment is improper" because "it constitutes an improper recasting of a negligence claim to an intentional tort claim." Hickory provided several reasons why Loya's claim sounded in negligence and concluded: "Since there is no other basis for Plaintiff's false imprisonment claim, she has failed to rebut the presumption that

---

[5] Neither party addresses the effect of the trial court's order vacating the first summary judgment on the interim summary-judgment ruling. The interim ruling did not grant summary judgment on any ground, but rather sought to clarify what elements Loya would need to plead and prove at trial and included the general structure of a proposed jury charge. In the vacatur order, the trial court did not address the interim ruling. The court expressly stated the grounds for its ruling: "for the technical reason that a central ground on which [the trial court] granted final summary judgment was first raised by [Hickory] in a reply brief." We conclude the vacatur order did not apply to the interim summary-judgment ruling. *See Hahn v. Sw. Double D Ranch, LP*, No. 05-16-00111-CV, 2017 WL 1832505, at *2 (Tex. App.—Dallas May 8, 2017, no pet.) (mem. op.) (when an order is unambiguous, we construe it to give effect to the trial court's intent).

her cause of action is a health care liability claim. Thus, her false imprisonment claim must be dismissed with prejudice." After the trial court vacated its first summary judgment, Hickory reasserted this ground in its third motion for summary judgment, stating "Hickory Trail also moves for traditional summary judgment as to . . . Plaintiff's improper casting of a medical negligence claim as an 'intentional tort.'"

Thus, the specific ground on which Hickory moved for summary judgment was not what elements Loya must prove to support her claim for false imprisonment, but rather that Loya's false-imprisonment claim should be dismissed as a matter of law because it is an improper recasting of a medical negligence claim.[6] We disagree with that proposition.

If a plaintiff's cause of action meets the definition of a health care liability claim, several substantive and procedural requirements are triggered. For example, the plaintiff must give notice of the claim to the defendant sixty days before filing suit, *see* TEX. CIV. PRAC. & REM. CODE ANN.§ 74.051, must file the lawsuit within two years, *see id.* § 74.251, and must file an expert report no later than 120 days after the defendant answers the lawsuit, *see id.* § 74.351, among other requirements. We see nothing in the TMLA to suggest that a plaintiff whose claim meets the definition of a health care liability claim may assert only a negligence cause of action and

---

[6] Contrary to Hickory's contention, the trial court's interim summary-judgment ruling does not resolve this issue. Given that Hickory reasserted this ground in its third motion and the trial court subsequently granted the motion without stating its basis, we must address this issue as it was presented to the trial court. *De La Cruz*, 526 S.W.3d at 592.

failure to do so must result in dismissal. The statutory definition of heath care liability claim does not include the word negligence, just that causes of action may sound in tort or contract. *See id.* § 74.001(a)(13). If the Legislature intended that all health care liability claims be brought under the rubric of a negligence cause of action, it knew how to say so. *See id.* § 74.101 (providing that negligence is the "only theory on which recovery may be obtained" in a suit for failure to disclose risks); *see also In re H.S.*, 550 S.W.3d 151, 157 (Tex. 2018) ("Had the Legislature intended to require such authority, it would have said so.").

The cases Hickory relied on in its summary-judgment motion stand for the proposition that a party may not recast a health care liability claim as another cause of action *to avoid the requirements* of the TMLA. *See Pruett v. Pittman*, No. 05-13-00634-CV, 2014 WL 2807983, at *4 (Tex. App.—Dallas June 18, 2014, no pet.) (mem. op.) (plaintiff could not avoid the TMLA's expert-report requirements by pleading fraud and misrepresentation); *Tex. Laurel Ridge Hosp., L.P. v. Almazan*, 374 S.W.3d 601, 603 (Tex. App.—San Antonio 2012, no pet.) (same); *see also Diversicare*, 185 S.W.3d at 851 (plaintiff could not avoid TMLA's two-year statute of limitations by recasting her claims as fraudulent-inducement claims, which would otherwise be subject to a four-year limitations period). Loya did not attempt to avoid the TMLA. Rather, she filed a Chapter 74 expert report to substantiate her false-imprisonment claim that, had she been examined as statutorily required, she would not have been involuntarily committed. *See Hickory I*, 2016 WL 7376559, at *2.

We conclude that the TMLA did not bar Loya's false-imprisonment cause of action as a matter of law.

### C. Whether Loya's Evidence Created a Genuine Issue of Material Fact as to Each Element of Her False-Imprisonment Claim (Issues 1–7)

The elements of false imprisonment are (1) willful detention, (2) without consent, and (3) without authority of law. *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). A detention can be accomplished by any means "which restrains the party so detained from removing from one place to another as he may see proper." *Martinez v. Goodyear Tire & Rubber Co.*, 651 S.W.2d 18, 20 (Tex. App.—San Antonio 1983, no writ). Although Hickory asserted no-evidence challenges to each element in its first and third motions for summary judgment,[7] on appeal it does not dispute that Loya met her burden on the first two elements.[8] We therefore focus our analysis on the third element—whether there was a genuine issue of material fact that Hickory's detention of Loya was without authority.

Loya divides her false-imprisonment claim into three periods of detention: first, from the time Dr. Bhatia told her she was being involuntarily admitted for

---

[7] Hickory also asserted there was no evidence to overcome the "presumption of immunity" provided in Section 571.019 of the Texas Mental Health Code (TMHC). *See* TEX. HEALTH & SAFETY CODE ANN. § 571.019. We address this issue in our discussion of Hickory's affirmative defenses.

[8] Regarding the first element, there is no dispute that after Marquart assessed Loya, Dr. Bhatia told Loya that she was being admitted and subsequently filed an application for court-ordered mental health services. As to the second element, there is no dispute that Loya said that she could not be admitted. Additionally, in a self-assessment report in Loya's medical records, Loya wrote, "being here is not what I want." We conclude that Loya presented more than a scintilla of evidence that Hickory willfully detained her and that she did not consent to the detention.

inpatient treatment to the time the mental-health court entered its order of protective custody; second, from the entry of said order to the time the mental-health court ordered Loya's release; and third, from the time of the release order until Loya was finally allowed to leave the hospital. For ease of reference we will call these the pre-custody, custody, and post-custody periods. Where necessary based on the parties' issues, we will analyze the periods of detention and applicable procedures separately.

To overcome no-evidence summary judgment on the third element of her false-imprisonment claim, Loya had to present more than a scintilla of evidence that Hickory lacked authority to detain her. *See Castillo*, 693 S.W.2d at 375.

A mental-health facility's authority to detain a patient against her will is subject to constitutional limitations. Each person in Texas has a federal and state constitutional right not to be involuntarily committed except upon sufficient evidence. *Hickory I*, 2016 WL 7376559, at \*2 (citing *O'Connor v. Donaldson*, 422 U.S. 563, 575–76 (1975), and TEX. CONST. art. I, § 15-a ("No person shall be committed as a person of unsound mind except on competent medical or psychiatric testimony.")). To safeguard these rights while also ensuring that those with severe mental illness have access to humane care, the Legislature enacted the TMHC. *See* TEX. HEALTH & SAFETY CODE ANN. § 571.002 (stating purpose of TMHC). Texas courts have long held that the "statutory requirements for an involuntary commitment are strict" because it is "a drastic measure" and potentially "depriv[es]

–16–

an individual of his liberty." *In re C.O.*, 65 S.W.3d 175, 182 (Tex. App.—Tyler 2001, no pet.); *see also In re State for Gill*, 680 S.W.2d 41, 42 (Tex. App.—Amarillo 1984, no writ) (noting that strict compliance with TMHC requirements "is mandated and is a prerequisite to its valid exercise").

Loya argues that there is some evidence that Hickory lacked authority to detain her because it failed to comply with the TMHC. To resolve this issue, we must first determine which of the TMHC's provisions are applicable and what they require. In construing statutes, our primary objective is to give effect to the Legislature's intent as expressed in the statute's language. *State v. K.E.W.*, 315 S.W.3d 16, 21 (Tex. 2010). We rely on the plain meaning of the text unless a different meaning is supplied by legislative definition, is apparent from the context, or unless such a construction leads to absurd results. *Id.* Language in a statute is presumed to have been selected and used with care, and every word or phrase in a statute is presumed to have been intentionally used with a meaning and purpose. *Id.* Proper construction requires reading the statute as a whole rather than interpreting provisions in isolation. *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 701 (Tex. 2015) (orig. proceeding). We give effect to "every sentence, clause, and word of a statute" so that no part of it is rendered superfluous. *Duarte v. Disanti*, 292 S.W.3d 733, 735 (Tex. App.—Dallas 2009, no pet.). We also consider the objective the law seeks to obtain and the consequences of a particular construction. *Id.* Finally, we do

not give a statute meaning that conflicts with other provisions if we can reasonably harmonize the provisions. *Id.*

Chapters 572 ("Voluntary Mental Health Services"), 573 ("Emergency Detentions"), and 574 ("Court-Ordered Mental Health Services") of the TMHC provide the statutory construct and authorization for the detention of a mental-health patient and provision of mental-health services either on a voluntary basis or under court order. We discuss each in turn.

### 1. Chapter 572 - Voluntary Mental Health Services

At the time Loya was detained,[9] Section 572.001 of the TMHC provided that a person "may request admission to an inpatient mental health facility by filing a request with the administrator of the facility to which admission is requested." *See* Acts 2003, 78th Leg., ch. 1000, § 1, eff. June 20, 2003.[10] On the proper request for voluntary inpatient or outpatient services, the facility's administrator or the administrator's authorized, qualified designee was authorized to admit a person if the administrator or designee determined (1) from a preliminary examination that the person has symptoms of mental illness and will benefit from the inpatient or outpatient services; (2) that the person has been informed of the person's rights as a

---

[9] As a threshold matter, we note that Loya's detention at Hickory occurred in February 2013. Although various TMHC provisions have been amended since then, our discussion is limited to the statutes in effect at the time of the detention. *See City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) ("The statute in effect at the time of injury controls.").

[10] *Amended by* Acts 2013, 83rd Leg., ch. 566 (S.B. 718), § 2, *amended by* Acts 2019, 86th Leg., ch. 988 (S.B. 1238), § 2, eff. Sept. 1, 2019 (current version at TEX. HEALTH & SAFETY CODE ANN. § 572.001).

voluntary patient; and (3) that the admission was voluntarily agreed to. *See id.*[11] A voluntary patient is entitled to leave an inpatient mental-health facility on a written request for discharge, and any employee of the facility whom the patient informs of his or her desire to leave must assist the patient in creating the written request. TEX. HEALTH & SAFETY CODE ANN. § 572.004(a). Within four hours of the discharge request, the physician responsible for the patient's care must be notified of the request, and the physician must discharge the patient unless the physician has reasonable cause to believe the patient might meet the criteria for emergency detention (Chapter 573) or court-ordered mental-health services (Chapter 574). *Id.* § 572.004(b), (c). If the physician has such a reasonable belief, the physician must examine the patient as soon as possible within twenty-four hours of the discharge request to determine if the patient meets the requirements for emergency detention or court-ordered mental-health services. *Id.* § 572.004(d). If the requirements are not met, the physician must discharge the patient. *See id.* If the requirements are met, the physician must file an application, and obtain a written order, for further detention under Chapter 573 or 574 by 4:00 p.m. the next business day. *Id.* The patient is not entitled to leave unless (1) a discharge request is filed or (2) an application under Chapter 573 or 574 is filed "and the patient is detained in accordance with the [TMHC]." *Id.* § 572.004(f).

---

[11] *Amended by* Acts 2013, 83rd Leg., ch. 566 (S.B. 718), § 3, eff. June 14, 2013 (current version at TEX. HEALTH & SAFETY CODE ANN. § 572.002).

Loya argues that her detention was unauthorized because she was never examined by a physician before being admitted. In her affidavit, Loya testified that after her interview with Marquart, Dr. Bhatia "came into the room and informed [her] that [she] was being admitted for in-patient treatment." Loya continued:

> Dr. Bhatia stated that the reason I had to remain at Hickory Trail is that I did not participate in the Partial Hospitalization Program the previous week. I explained that I could not be detained at Hickory Trail because I had two children to care for and a full-time job. However, I was told that I could not leave and that Hickory Trail had already started the process of obtaining a court order that would not allow me to leave. At no time on February 25, 2013 did I ever undergo any sort of assessment or examination by a physician. My only interaction with a physician was the very brief meeting with Dr. Bhatia in which he informed me that I was being detained, which meeting lasted only a few minutes at most.

Loya also offered an "observation" log from her medical records. The log contains entries of fifteen-minute intervals detailing her activities on the first day of her admission. Each item is coded with a number that corresponds to a list of tasks (for example, item 18 on the list is "In Therapy," item 24 is "Meals," item 29 is "Meds"). The first entry on the log corresponding to a meeting "With Physician" (item 31) occurs at 6:45 p.m., several hours after Loya's admission at approximately 1:00 p.m. Marquart, in her deposition, acknowledged that the log does not reflect Dr. Bhatia's meeting with Loya, but testified that the meeting did occur. Nevertheless, Marquart conceded she had already left the room before the meeting, and her affidavit states merely that she "believe[d] Dr. Bhatia most likely assessed Marvella Loya prior to seeking an Order of Protective Custody."

In its third motion for summary judgment, Hickory argued that whether Loya "likes it or not" the meeting "was apparently enough of an examination for Dr. Bhatia . . . to reach the conclusion involuntary commitment was required when [Loya] requested to leave." Hickory continued, "though it may have been brief . . . , [Loya] was in fact examined by Dr. Bhatia during their February 25, 2013 meeting." We disagree. Prior to admission as an inpatient, the prospective patient must be examined by a physician within the previous three days, and the examination must include "a physical and psychiatric examination conducted in the physical presence of the patient or by using audiovisual telecommunications." *See* 25 TEX. ADMIN. CODE § 411.461(f)(1), *repealed and readopted at* 26 TEX. ADMIN. CODE § 568.22(h)(1). Loya testified that her meeting with Dr. Bhatia was a few minutes at most and that all he said was that she was being admitted. The observation log supports Loya's contention that her meeting with Dr. Bhatia was relatively short. Loya's retained expert testified that, before ordering involuntary admission, a physician must conduct a "thorough" examination of the patient's mental-health status, including a psychiatric interview. On this record, there is more than a scintilla of evidence that Dr. Bhatia did not examine Loya prior to her detention. *See James v. Brown*, 637 S.W.2d 914, 918 (Tex. 1982) (fact question existed about psychiatrists' negligence where expert affidavits stated the patient was "not mentally ill" and that the psychiatrists' diagnoses "could not have been arrived at properly during their brief periods of observation").

In the alternative, Hickory argues that Loya's detention complied with Chapter 572 because she was a "voluntary patient" under Section 572.001 of the Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ANN. § 572.001. In support, Hickory points to the disclosure statement Loya signed as a part of her screening process, which Loya attached to her response to Hickory's first summary-judgment motion. Loya responds that she was not a voluntary patient because she was receiving outpatient treatment. Loya cites the rules promulgated by the Health and Human Services Commission (Commission), which define "voluntary patient" as "[a] patient who is receiving inpatient mental health treatment." *See* 25 TEX. ADMIN. CODE § 411.453(60), *repealed and readopted at* 26 TEX. ADMIN. CODE § 568.3(56). Hickory acknowledges this definition but argues that it conflicts with, and must be resolved in favor of, the statute. Hickory bases its argument on the TMHC's definition of "patient" and the language of Section 572.001. The TMHC defines "patient" as "an individual who is receiving voluntary or involuntary mental health services under this subtitle." *See* TEX. HEALTH & SAFETY CODE ANN. § 571.003(16). Section 572.001 provides that a person may "request admission to an inpatient mental health facility or for outpatient mental health services." *See id.* § 572.001(a). Thus, according to Hickory, a "patient" who voluntarily seeks outpatient care is just as much a "voluntary patient" as one who requests admission at an inpatient facility. Applying its interpretation to the facts of this case, Hickory argues that Loya "consented to an assessment" by a qualified mental-health

professional and, as a voluntary patient, was not entitled to leave until she complied with the discharge provisions of Section 572.004. Thus, Hickory concludes, Loya's telling Dr. Bhatia she wanted to leave triggered the 24-hour timeline for a physician to examine Loya to determine whether emergency detention or court-ordered mental-health services were warranted. *See id.* § 572.004(d).

We reject Hickory's argument.[12] Whatever conflict may now exist between the regulatory definition and statutory usage of "voluntary patient," it did not exist in February 2013 when Loya was involuntarily detained. At the time, Section 572.001 did not include the phrase "outpatient mental health services." *See* Acts 2003, 78th Leg., ch. 1000, § 1, eff. June 20, 2003. Rather, Chapter 572 applied only to persons requesting admission to an inpatient mental-health facility. *See id.*[13] During the pre-admission screening process, the person was referred to as a "prospective voluntary patient." *See id.*[14] Upon examination by a physician, the prospective voluntary patient could be admitted and would become a "voluntary

---

[12] Even if Loya initially consented to being detained, she withdrew that consent when she was told she was going to be admitted. *See Huntress v. Hickory Trail Hosp., L.P.*, No. 05-19-00892-CV, 2020 WL 2781795, at *9 (Tex. App.—Dallas May 29, 2020, pet. denied) (mem. op.) (summary judgment in Hickory's favor was improper because, although the patient may have later consented to her confinement, she "presented at least some evidence that she was detained, without her consent, and without lawful authority from the time of her admission . . . until the time of any such alleged consent."). Similarly, Loya may have consented initially to specific outpatient services, but the record contains clear evidence that the consent was withdrawn. As Hickory concedes, once Dr. Bhatia advised Loya that she would be admitted, "Loya insisted she be able to go home, or in other words, no longer wished to be a voluntary patient, i.e. requested to be discharged." Thus, Loya presented at least some evidence that she was detained without her consent from the time she was admitted for inpatient treatment to the time she was ultimately discharged.

[13] Current version at TEX. HEALTH & SAFETY CODE ANN. § 572.001(a).

[14] *Amended by* Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.1364, *amended by* Acts 2019, 86th Leg., ch. 988 (S.B. 1238), § 3, eff. Sept. 1, 2019 (current version at TEX. HEALTH & SAFETY CODE ANN. § 572.0025(f)).

patient." *See id.* The voluntary patient could then request to leave, which triggered the discharge provisions of Section 572.004. *See* TEX. HEALTH & SAFETY CODE ANN. § 572.004. But if the person was never admitted as a voluntary patient, nothing in Chapter 572 authorized the person's involuntary detention.[15]

Finally, Hickory argues that Loya's interpretation of Chapter 572—i.e., that "voluntary patient" means a patient voluntarily admitted for *inpatient* treatment—leads to absurd results. In support, Hickory proposes a hypothetical scenario in which a patient visits a mental-health facility for outpatient services, discloses during her assessment that she is having suicidal thoughts, but is sent home and commits suicide. Hickory argues that in the "almost certain litigation that would follow," Loya's interpretation of Chapter 572 puts mental-health providers "in the untenable position of allowing a suicidal patient to go home, exposing them to potential professional negligence liability in the event the patient harmed herself, or detain the patient for her safety, but be forced to face an action for false imprisonment."

---

[15] We note the current version of Chapter 572 largely retains this framework. In 2013, when the Legislature amended Chapter 572, it inadvertently created the issue Hickory points out in this appeal. *See* Acts 2013, 83rd Leg., ch. 566 (S.B. 718), § 2. Namely, Chapter 572 seemingly covers two classes of persons: voluntary *in*patients and voluntary *out*patients (labels ours). The Legislature did not amend Section 274.004, however, and as a result the statute seems to imply that both classes of patients are subject to its discharge provisions. It appears the Commission has recognized and attempted to rectify this issue. When the Commission repealed Chapter 411 of the Administrative Code and readopted its provisions under Chapter 568, it added a new provision: "An individual who voluntarily presents to the hospital may leave the hospital at any time during the pre-admission screening and assessment process prior to their admission." *See* 26 TEX. ADMIN. CODE § 568.22(d). Although the current provisions of Chapter 572 are not relevant to the issues before us, we note the inconsistency and acknowledge it is for the Legislature to review Chapter 572 of the TMHC and consider whether clarification is warranted.

We decline Hickory's invitation to speculate about its potential liability in the scenario it describes.[16] We nevertheless conclude that Loya's interpretation does not lead to absurd results for two reasons. First, as we explained above, the version of Chapter 572 that was in effect in February 2013 is amenable only to Loya's interpretation. Second, the Legislature foresaw the exact scenario Hickory describes and enacted Chapter 573 to address it. *See id.* § 573.001 *et seq.* (authorizing emergency detention by warrant or warrantless apprehension by a peace officer). We are not persuaded by Hickory's argument that a mental-health facility should not be required to obtain a warrant for emergency detention or call the police if a suicidal patient is already at the hospital. The TMHC was enacted not for the convenience of mental-health facilities, but rather to strike a balance between patients' liberty interests and the State's public-safety interest.[17] *See id.* § 571.002. It is not absurd to conclude that the only instance where a facility may detain a person *before* obtaining a court order is if the person has voluntarily agreed to relinquish their liberty by

[16] Doing so would constitute an advisory opinion, which we have no jurisdiction to render. *Abbott v. Mexican Am. Legislative Caucus, Tex. House of Representatives*, 647 S.W.3d 681, 689 (Tex. 2022); *see also AEP Tex. N. Co. v. SPA Pipe, Inc.*, No. 03-06-00122-CV, 2008 WL 5210919, at *5, n.8 (Tex. App.—Austin Dec. 12, 2008, pet. dism'd) (mem. op.) (declining to address hypothetical effect of a certain statutory interpretation on grounds that it would constitute an advisory opinion). Hickory's potential liability is not before us; we may opine only on its actual liability.

[17] Chapter 574 exemplifies this balancing. Under Section 574.011, a certificate of mental illness may support an application for court-ordered mental health services if it includes the physician's opinion that the potential patient "is likely to cause serious harm" to the patient or to others. *See id.* § 574.011(a)(7). But if the certificate is offered in support of a motion for order of protective custody, it must state that the "person presents a substantial risk of serious harm to himself or others if not immediately restrained." *Id.* §574.011(d). During the pendency of the application for court-ordered mental health services, a patient "is entitled to remain at liberty" unless detained by "an appropriate provision of [the TMHC]." The result is that a person who is merely *likely* to cause serious harm is entitled to remain at liberty until the hearing, while a person who is at *substantial risk* of causing harm may be detained before the hearing.

–25–

checking in as an inpatient. *See id.* § 572.001(b), (e) (providing that an admission request must be signed by the prospective patient and must state that the patient agrees to voluntarily remain in the facility until the earlier of the patient's discharge or the period prescribed by Section 572.004).

Under the version of Chapter 572 that existed at the time of Loya's detention, a "voluntary patient" was a person who voluntarily agreed to *inpatient* treatment, and the person could not be admitted unless examined by a physician. Loya presented more than a scintilla of evidence that she did not seek inpatient treatment and was not examined by a physician. We therefore conclude that there is more than a scintilla of evidence that Chapter 572 did not authorize Loya's detention before the order of protective custody was issued.

### 2. Chapter 573 – Emergency Detention

In its endeavor to justify Loya's detention, Hickory argues that its application for court-ordered mental-health services and motion for order of protective custody also complied with the requirements for an application for emergency detention. As a result, Hickory contends it was authorized to detain Loya for forty-eight hours pending her preliminary examination. *See* TEX. HEALTH & SAFETY CODE ANN. § 573.021(b). We disagree. Under Chapter 573, the application must state that the person's risk of self-harm or harm to others is "imminent," and it cannot be granted unless there is reasonable cause to believe that immediate restraint cannot be

accomplished without emergency detention. *See id.* §§ 573.011(b)(4), .012(b)(3)–(4). Here, the application and order of protective custody lacked these statements.

We decline to conflate the Chapter 573 and 574 statutory frameworks. In enacting the TMHC, the Legislature provided different procedures for emergency detention and protective custody. These provisions require strict compliance. *C.O.*, 65 S.W.3d at 182; *Gill*, 680 S.W.2d at 42. We cannot assume the Legislature intended the procedures of one chapter to be used to procure an order under a different chapter. *See K.E.W.*, 315 S.W.3d at 21 ("Language in a statute is presumed to have been selected and used with care, and every word or phrase in a statute is presumed to have been intentionally used with a meaning and purpose."). We were cited no authority, and we have found none, wherein there is a basis to conclude that an application under Chapter 574 can double as an application under Chapter 573. Therefore, we conclude that the two statutory constructs must rise and fall on their own merits and that Chapter 573 was never invoked on the record before us.[18]

### 3.      *Chapter 574 – Court-Ordered Mental Health Services*

Under Chapter 574, a sworn application for court-ordered mental-health services may be filed by a county or district attorney, or by any other adult if the application is accompanied by a certificate of medical examination. TEX. HEALTH & SAFETY CODE ANN. § 574.001(a). The application must state whether it is for

---

[18] We note that *Hickory I* was based upon an analysis of Chapter 572 and 574 requirements.

temporary or extended mental-health services. *Id.* The application must also contain, among other things, a statement that the proposed patient has a mental illness and meets the criteria in Section 574.034 (temporary inpatient services), 574.0345 (temporary outpatient services), 574.035 (extended inpatient services), or 574.0355 (extended outpatient services). *See* Acts 1991, 72nd Leg., ch. 76, § 1, eff. Sept. 1, 1991.[19] The criteria relevant here (temporary inpatient services) include that the proposed patient has a mental illness and as a result, the proposed patient: (A) is likely to cause serious harm to the proposed patient; (B) is likely to cause serious harm to others; or (C) is suffering severe abnormal mental, emotional, or physical distress; experiencing substantial mental or physical deterioration; and unable to make a rational and informed decision as to whether to submit to treatment. *See* Acts 1997, 75th Leg., ch. 744, § 5, eff. Sept. 1, 1997.[20]

An application filed under Chapter 574 must be heard within fourteen days, and the prospective patient is entitled to certain constitutional and procedural rights. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 574.005(a) (governing the hearing date and continuances); 574.003(a) (right to appointment of an attorney); 574.032(a) (right to a jury). A hearing may not be held unless there are on file at least two certificates of medical examination for mental illness completed by different

---

[19] *Amended by* Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.1372, *amended by* Acts 2019, 86th Leg., ch. 582 (S.B. 362), § 8, eff. Sept. 1, 2019 (current version at TEX. HEALTH & SAFETY CODE ANN. § 574.002(c)).

[20] *Amended by* Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.1379, eff. April 2, 2015 (current version at TEX. HEALTH & SAFETY CODE ANN. § 574.034(a)).

physicians, each of whom has examined the proposed patient during the preceding thirty days. *Id.* § 574.009. The certificates must be sworn to and signed by the examining physicians and must include, among other things, each physician's opinion that: the examined person has a mental illness and as a result, is likely to cause serious harm to the person or to others or is suffering severe abnormal mental, emotional, or physical distress; experiencing substantial mental or physical deterioration; and unable to make a rational and informed decision as to whether or not to submit to treatment. Acts 1997, 75th Leg., ch. 744, § 2, eff. Sept. 1, 1997.[21]

The proposed patient is entitled to remain at liberty pending the hearing unless detained under an appropriate provision of the TMHC. TEX. HEALTH & SAFETY CODE ANN. § 574.013. Under Section 574.021, a motion for order of protective custody may be filed—by the county or district attorney or the court on its own motion—in the court in which the application for court-ordered mental-health services is pending. *Id.* § 574.021(a), (b). The motion must state that the judge or district or county attorney has reason to believe, and does believe, that the proposed patient meets the criteria authorizing the court to order protective custody and the belief is derived from the representations of a credible person, the proposed patient's conduct, or the circumstances under which the proposed patient is found. *Id.* § 574.021(c). The motion must be accompanied by a certificate of medical

---

[21] *Amended by* Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.1373, eff. April 2, 2015 (current version at TEX. HEALTH & SAFETY CODE ANN. § 574.011(a)(7)).

examination prepared by a physician who has examined the proposed patient within the previous three days prior to filing of the motion. *Id.* § 574.021(d). The motion may be granted if the judge or designated magistrate determines that a physician has stated the physician's opinion that the proposed patient has a mental illness and presents a substantial risk of serious harm to the proposed patient or others if not immediately restrained pending the hearing. *See* Acts 1991, 72nd Leg., ch. 76, § 1, eff. Sept. 1, 1991.[22] If the motion is granted, the proposed patient must be detained at the facility until a probable-cause hearing is held. TEX. HEALTH & SAFETY CODE ANN. § 574.023(b). A probable-cause hearing must be held within seventy-two hours after the time the proposed patient was detained pursuant to the court's protective-custody order. *Id.* § 574.025(a), (b). The proposed patient is entitled to appear with counsel and present evidence to challenge the allegation that the proposed patient presents a substantial risk of harm to the proposed patient or to others. *Id.* § 574.025(d). If the court determines probable cause exists to believe that the proposed patient presents a substantial risk of serious harm to himself or others such that the proposed patient cannot remain at liberty, the court must order continued detention until the final hearing on the application for court-ordered mental-health services. *Id.* § 574.026(a). If the court finds a lack of such probable cause, the court

---

[22] *Amended by* Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.1374, eff. April 2, 2015 (current version at TEX. HEALTH & SAFETY CODE ANN. § 574.022(a)).

must order the release of the proposed patient pending the final hearing. *Id.* § 574.028(a).

Unlike Chapter 572, there is no provision under Chapter 574 that authorizes a person's detention before the court issues an order. *See id.* § 574.013 ("The proposed patient is entitled to remain at liberty pending the hearing on the application unless the person is detained under an appropriate provision of this subtitle."). Here, Hickory filed a motion for an order of protective custody, which the trial court granted. Loya argues that Dr. Bhatia's certificate of medical examination contained knowingly false statements and amounted to a fraud on the mental-health court. Hickory responds that there was no fraud on the court because the statements in the certificate were true. Alternatively, Hickory argues that even if Loya's allegations of fraud were meritorious, her claim for false imprisonment is barred as a matter of law. *See James*, 637 S.W.2d at 918 (Tex. 1982).

Although Hickory's second argument is based on a traditional ground for summary judgment, we will address it here as it is dispositive on the false-affidavit issue. In *James*, the supreme court considered the TMHC's applicability to claims of libel, medical negligence, false imprisonment, and malicious prosecution. *See id.* at 917. With respect to the false-imprisonment claim, the Court concluded that "Mrs. James has failed to state a cause of action for false imprisonment." *Id.* at 918. The Court explained: "If an arrest or detention is executed under process which is legally sufficient in form and duly issued by a court of competent jurisdiction, an action for

false imprisonment will not lie." *Id.* Because James was detained as a result of a valid arrest warrant signed by a probate judge, the Court affirmed the trial court's summary judgment against her on her false-imprisonment claim. *See id.* (citing *Pate v. Stevens*, 257 S.W.2d 763, 766 (Tex. App.—Texarkana 1953, writ dism'd)).

The underlying rationale for the *James* Court's holding involves the development of the false-imprisonment and malicious-prosecution causes of action. At common law, false imprisonment was a suit for trespass, while malicious prosecution was an "action upon the case." *See Hubbard v. Lord*, 59 Tex. 384, 385 (1883). "The first could be maintained only when the arrest was made without legal process; and the latter when the process of the law had been perverted and improperly used without probable cause and for a malicious purpose." *Id.* Although Texas abolished the common law *forms* of action, "the principles upon which these distinctions rest are as applicable to our system as to any other." *Id.* Accordingly, Texas courts have uniformly held that a valid warrant is an absolute bar to claims of false imprisonment and false arrest. *See, e.g.*, *Martinez v. English*, 267 S.W.3d 521, 529 (Tex. App.—Austin 2008, pet. denied); *Cantu v. Botello*, 910 S.W.2d 65, 66 (Tex. App.—Corpus Christi–Edinburg 1995, no writ). The rule holds even if the affidavit supporting the warrant contained knowingly false statements by the affiant. *See Pate*, 257 S.W.2d at 766–67.

In *James*, the plaintiff was detained under a warrant for emergency detention under the predecessor statute to Chapter 573. *See James*, 637 S.W.2d at 918.

Although the Court did not cite Chapter 574's predecessor statute, we conclude here that its rationale extends to orders of protective custody. *See* TEX. REV. CIV. STAT. ANN. art. 5547–36[23] (authorizing orders of protective custody). The *James* Court did not limit its holding to arrests effectuated under warrant; rather, it held that a false-imprisonment claim is barred if the "arrest *or* detention" is based on "legally sufficient process"[24] that is "issued by a court of competent jurisdiction." *See James*, 637 S.W.2d at 918. All of these requirements clearly apply to an order of protective custody. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 574.021–.022 (listing requirements for an order authorizing detention of a patient for mental-health reasons). Because there is a dearth of cases in which an order of protective custody under Chapter 574 was challenged on grounds that the underlying certificate contained false statements, as an issue of first impression, we rely on arrest-warrant cases for false-imprisonment challenges. To determine the validity of an arrest warrant, "we look only to the form of the process by which the arrest warrant was made." *See Martinez*, 267 S.W.3d at 529. "[W]e do not determine, for example, whether probable cause existed to issue the warrant." *Id.*

Here, as in *Martinez*, Loya challenges the grounds on which the order of protective custody was issued, not the order's facial validity. As such, Loya's

---

[23] Codified as amended at TEX. HEALTH & SAFETY CODE ANN. § 574.021–.022.

[24] Probable-cause affidavits justify issuance by neutral magistrate of an arrest warrant, *see* TEX. CODE CRIM. PROC. ANN. arts. 15.01–.05, and a certificate of medical examination for issuance of protective custody by the mental health court, *see* TEX. HEALTH & SAFETY CODE ANN. §§ 574.021–.022.

claim—with respect to her detention during the custody period—sounds in malicious prosecution,[25] not false imprisonment.

We affirm the trial court's summary judgment of Loya's false-imprisonment claim as to the custody period of her detention.

### 4. Demand to Leave

Hickory also argues that Loya presented no evidence that she demanded to leave after the mental-health court ordered her release. For this argument, Hickory relies on *Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877, 900 (Tex. App.—Dallas 2000, pet. denied). In *Turner*, we affirmed the trial court's grant of a no-evidence summary judgment on Turner's false-imprisonment claim. *See id.* at 903. In summarizing the evidence Turner submitted, we said:

> Turner stated in his affidavit that he was not allowed to leave the behavioral science unit for an unspecified period of time and that he was forced to take psychiatric tests and to participate in psychiatric therapy. Although Turner stated in his affidavit that he "was not permitted to leave the unit when [he] tried to do so," the evidence does not show that Turner ever demanded and was refused a transfer from the behavioral science unit to another section of the hospital or that he ever demanded and was refused discharge from the hospital.

*Id.* at 900–01 (footnotes omitted). We concluded that "[a]lthough Turner complained of his care, he presented no evidence that he wanted to leave the hospital." *Id.* at 901.

Contrary to Hickory's argument, *Turner* does not stand for the proposition that a "demand to leave" is required for a false-imprisonment claim. We made that

---

[25] Loya did not assert a claim for malicious prosecution; therefore, we are unable to address whether the process was perverted, or used improperly for malicious purposes.

–34–

statement in *Turner* in response to Turner's own allegation that he was not permitted to leave the hospital when he tried to do so. *See id.* Here, there was ample evidence that Loya demanded to leave Hickory's facility multiple times through multiple channels. On February 25, 2013, she told Dr. Bhatia that she could not stay for inpatient treatment and maintained that position throughout her involuntary stay. On February 27, she wrote in a self-assessment form that she did not "want to be here." On February 28, she appeared at the probable cause hearing and presented evidence to terminate her detention. She was not required to make an additional demand after returning to the hospital from the probable cause hearing wherein the court specifically found no probable cause that Loya presented a substantial risk of self-harm and ordered her to be immediately released.

We reject Hickory's argument that Loya was required to present evidence that she demanded to leave during the post-custody period.

### 5.   *Summary*

Based on the foregoing, we conclude that Chapters 572 and 573 did not apply and therefore did not authorize Loya's detention. We conclude that Chapter 574 did apply, and the order of protective custody issued by the mental-health court was an absolute bar to Loya's false-imprisonment claim. However, that conclusion is limited to the custody period. With respect to the pre-custody and post-custody periods, we conclude there was some evidence that Hickory's detention of Loya was

without legal authority such that a fact issue was raised to negate summary judgment.[26]

### D. Whether Hickory Conclusively Negated the Causation Element of Loya's False-Imprisonment Claim (Issue 12)

In its first motion, Hickory moved for traditional summary judgment on the ground that the evidence conclusively negated causation. Hickory based that argument on the dissenting opinion in *Hickory I*. *See Hickory I*, 2016 WL 7376559, at \*9 (Lang, J., dissenting). The majority opinion concluded that Loya's expert report sufficiently addressed the causal link between the alleged breach of the standard of care and Loya's injury. *See id.* at \*5. In reaching that conclusion, we "necessarily reject[ed] Hickory Trail's assertion that to establish causation, [Loya's expert] was required to state explicitly that had a physician conducted a psychiatric assessment, Loya would have avoided involuntary hospitalization and the alleged damages arising therefrom without increasing the risk of suicide or other self-harm." *See id.* The dissent disagreed, concluding that the causation element required the expert to state the "how and why" of causation. *See id.* at \*9 (Lang, J., dissenting). The dissent opined that because Loya's false-imprisonment claim was based on the breach of the standard of care, we must consider what breach Loya alleged and how that breach injured her. *See id.* Noting that Loya characterized Hickory's breach as the failure

---

[26] Because we address lack of authority under our no-evidence analysis, we need not address Hickory's argument, asserted as a traditional ground in its third summary-judgment motion, that the evidence conclusively establishes that it had authority to detain Loya. *See De La Cruz*, 526 S.W.3d at 592 (we address no-evidence points first so as to potentially pretermit the need for further analysis).

to have a physician examine her, the dissent would have held that the expert report on causation "must address whether a proper assessment would have resulted in involuntary commitment." *See id.* at *8.

In the summary-judgment motion, Hickory seized on the dissenting opinion's statement that "the record shows that if a proper assessment by a physician on the date in question would have resulted in involuntary commitment of Loya, the breach in question did not cause her alleged injury." *See id.* Hickory argued that, as a result, Loya "cannot establish that her alleged damages would be any different had a physician initially assessed her." Hickory continued: "The bar for evidence as to this element is too high, especially for [Loya's] alleged facts."

Hickory confuses the summary-judgment standard and the requirements for an expert report under the TMLA. For an expert report to pass muster under the TMLA, the expert must fairly summarize the standard of care, explain how it was breached, and establish the causal relationship between the breach and the harm alleged. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). "A report that satisfies these requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Id.* The question before us in *Hickory I* was whether Loya's expert sufficiently tied the breach of the standard of care *as he defined it* to Loya's damages. *See Hickory I*, 2016 WL 7376559, at *6. Hickory's burden on summary judgment was to conclusively *negate* the causation element of Loya's false-imprisonment claim. *See Ward*, 443 S.W.3d

at 342. That burden must be met with competent summary-judgment evidence. *See id.* It cannot be met by citation to a dissenting opinion about an expert report's compliance with the TMLA and a bald assertion that the evidentiary standard is too high.

We conclude Hickory failed to meet its burden to conclusively negate the causation element of Loya's claim for false imprisonment.

### E. Whether Hickory Conclusively Established Each Element of Its Affirmative Defense of Immunity (Issue 11)

In the first and third motions for summary judgment, Hickory complained that there was "no evidence of bad faith or unreasonable acts by [Hickory] to rebut the presumption of immunity as required by §571.019." In the third motion for summary judgment, Hickory reasserted this ground but added, ostensibly as a traditional ground, that it was immune as a matter of law. But there again it argued that to overcome the immunity, Loya would have to prove that Hickory acted in bad faith or unreasonably.

In *Huntress*, we addressed the no-evidence argument Hickory made in the trial court. *See Huntress*, 2020 WL 2781795, at *9. We explained that the immunity offered by Section 571.019 is an affirmative defense, not a presumption. *See id.* ("[N]othing in [Section 571.019] creates a 'presumption;' rather, the language of the statute provides immunity if the person acts 'in good faith, reasonably and without negligence.'"). Thus, the burden was on Hickory to conclusively establish each element of its immunity defense as a matter of law.

Section 571.019(a) of the TMHC provides:

> A person who participates in the examination, certification, apprehension, custody, transportation, detention, treatment, or discharge of any person or in the performance of any other act required or authorized by this subtitle and who acts in good faith, reasonably, and without negligence is not criminally or civilly liable for that action.

In its third summary-judgment motion, Hickory stated, without citation to the evidence, that "[a]ll evidence demonstrates Hickory Trail staff acted with good faith and reasonableness." On appeal, Hickory similarly states, again without citation to the record, that Marquart "executed the application in good faith out of her concern for Ms. Loya." In both filings, Hickory apparently relies on the fact that Marquart's clinical diagnosis was approved by Dr. Bhatia and another physician. Even if we accepted the truth of that assertion, it does not establish immunity under Section 571.019(a). The question is whether Hickory acted "in good faith, reasonably, and without negligence" in detaining Loya, not whether it did so in diagnosing her mental illness. In light of our conclusion that there was more than a scintilla that Hickory willfully detained Loya against her will and without authority, we conclude there is more than a scintilla of evidence that Hickory's detention of Loya was not without negligence.

We conclude that Hickory did not meet its burden to establish each element of its affirmative defense of immunity under Section 571.019(a) as a matter of law.

**F.  Whether Hickory Conclusively Established Each Element of Its Affirmative Defense of Judicial-Proceedings Privilege (Issue 13)**

Hickory raised the judicial-proceedings privilege in its second motion for summary judgment. The motion expressly limited this ground for summary judgment to the custody period. We have already concluded that Loya's claim for false imprisonment during that period is barred. Accordingly, we need not address whether the judicial-proceedings privilege applies. *See* TEX. R. APP. P. 47.1.

## CONCLUSION

We affirm the trial court's summary judgment as to Loya's claim under the DTPA and Loya's false-imprisonment claim with respect to the time period beginning with the mental-health court's entry of the order of protective custody and ending with the mental-health court's order finding no probable cause. As to the trial court's summary judgment on Loya's false-imprisonment claim for the periods during which she was detained before and after said orders and affirmative defenses not established as a matter of law, we reverse the trial court's judgment and remand to the trial court for proceedings consistent with this opinion.


/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE


200378F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MARVELLA LOYA, Appellant

No. 05-20-00378-CV        V.

HICKORY TRAIL HOSPITAL,
L.P., Appellee

On Appeal from the 95th District
Court, Dallas County, Texas
Trial Court Cause No. DC-15-02031.
Opinion delivered by Justice
Goldstein. Justices Pedersen, III and
Smith participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's summary judgment on appellant MARVELLA LOYA's cause of action for false imprisonment for the periods before the mental health court entered its order of protective custody and after the mental health court issued its finding of no probable cause. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with the Court's opinion.

It is **ORDERED** that appellant MARVELLA LOYA recover her costs of this appeal from appellee HICKORY TRAIL HOSPITAL, L.P.

Judgment entered this 30th day of November 2022.